**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee/Cross-Appellant,

v.

STANLEY HOWARD SIMS,

    Defendant - Appellant/Cross-Appellee.

Nos. 03-2151, 03-2177

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-00-0193-MV)**

---

Tova Indritz, Albuquerque, New Mexico, for Appellant.

David N. Williams, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the briefs), Albuquerque, New Mexico, for Appellee.

---

Before **EBEL, BALDOCK,** and **HARTZ**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

    This case first arose in an Internet chat room where Stanley Howard Sims

("Defendant" or "Sims"), using the screenname "Nats565," began a sexually

explicit conversation with "sweetthingforyou16"—a screenname Sims believed belonged to a 16-year-old girl named Sue and a 12-year-old named Kate. In fact, "sweetthingforyou16" was a middle-aged man in Springfield, Missouri, who had assumed the Internet profile of a teenage dancer named Sue as a gag and who represented himself as both Sue and Kate to Sims. For months, Sims and "sweetthingforyou16" exchanged Internet communications of a graphic sexual nature, with Sims sending sexually explicit images of himself and of other children to the girls. The FBI became involved, and Sims was ultimately arrested at a roller-skating rink in Missouri, where he had traveled to meet Sue and Kate.

After a jury trial, Sims was convicted of three counts. Count One involved attempting to entice a minor to engage in sexual acts in violation of 18 U.S.C. § 2422(b). Count Two involved traveling in interstate commerce for the purpose of engaging in sexual acts with a minor in violation of 18 U.S.C. § 2423(b). Count Three involved transporting child pornography by interactive computer system in violation of 18 U.S.C. § 2252(a)(1). The district court entered a judgment of acquittal on Count Four, which involved receiving child pornography in violation of 18 U.S.C. § 2252(a)(2). Sims was sentenced to 37 months imprisonment and ordered to pay a $10,000 fine.

On appeal, Sims raises several issues including Fourth Amendment claims relating to the investigation of his conduct, First Amendment and other challenges

to his convictions, and several sentencing arguments.  The Government also cross-appeals aspects of Sims's sentence, including the district court's application of an acceptance of responsibility adjustment and the decision to grant a nine-level aberrant behavior departure.

After briefing in this case, Sims was permitted to file a supplemental brief with an argument that his sentence was constitutionally defective under Blakely v. Washington, 542 U.S. 296 (2004).  After oral argument, this court permitted further briefing from both sides relating to United States v. Booker, 125 S.Ct. 738 (2005).

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM Sims's conviction but REVERSE his sentence and REMAND for resentencing.

## BACKGROUND

At the time of the events in question, Sims was employed as an engineer at the National Transuranic Waste Program in Carlsbad, New Mexico.  He had no prior criminal history.  We review the facts only to the extent necessary to decide the issues presented in this appeal.

In September 1999, Sims, using the screen name "Nats565," began using an Internet chat room to converse with "sweetthingforyou16."  As far as Sims knew, this screen name belonged to a 16-year-old girl named Sue Walker and was shared by a 12-year-old named Kate, whom Sue babysat.  Over a period of five months,

Sims communicated with "sweetthingforyou16" frequently, usually daily, in chat rooms and through instant messages. These conversations were of a sexual nature. He gave the girls his personal e-mail address, and Sims eventually began attaching sexually explicit images, of himself and of other children, to the e-mail messages.

In reality, Sims was actually communicating with Michael Walker, an adult male in Missouri. According to Walker, he created the profile "sweetthingforyou16," identifying himself as "Sue," a dancer, as a gag, and he was approached by "Nats565" in a Yahoo! chat room for persons interested in model airplanes. Walker posed as a 16-year-old named Sue and a 12-year-old named Kate, and he started saving the e-mails and images sent to "the girls" by Sims.

In October 1999, Sims began suggesting he would travel to Missouri to meet Sue and Kate. In his messages, he referred to previous encounters with other young girls and emphasized that he was gentle and would not hurt the girls.

After Walker reported his Internet communications to the National Center for Missing and Exploited Children, local police and the FBI became involved. The FBI ultimately assumed the identities created by Walker and, as "sweetthingforyou16," made plans for Sims and the girls to meet at a roller-skating rink in Missouri. Sims planned to pick up the girls, hide them in the back

seat of his rental car, and go back to his motel to swim, engage in sexual acts, and take photographs. Sims was arrested on January 22, 2000, when he arrived at the roller-skating rink.

At the FBI office where he was taken, Sims signed a "Consent to Search" form, and his luggage, briefcase, hotel room, rental car, and personal belongings were searched—producing several cameras and film, gifts he bought for the girls, and assorted sexual paraphernalia and aids. Sims also made a statement to FBI at this time.

On the same day, Sims's home in New Mexico was searched, with the FBI seizing computer equipment, photographs, travel itineraries, and related items. A few days later, the FBI searched Sims's office, seizing other e-mail messages and travel itineraries. The FBI also obtained a warrant to search the contents of nineteen floppy disks found in Sims's possession at the time of his arrest, which produced several images of child pornography and other graphic e-mail messages.

The grand jury returned a four-count indictment against Sims, charging him with:

- Count One—attempting to coerce and entice a minor to engage in sexual acts, 18 U.S.C. § 2422(b);
- Count Two—traveling in interstate commerce for the purpose of engaging in sexual acts with a minor, id. § 2423(b));
- Count Three—transporting by interactive computer system visual depictions of minors engaging in sexually explicit conduct, id. § 2252(a)(1); and

- Count Four—receiving visual depictions of minors engaging in sexually explicit conduct, id. § 2252(a)(2).

Sims pled not guilty.

After pre-trial motions, the district court suppressed Sims's post-arrest statement on Miranda grounds after finding that Sims had requested, but not been provided, an attorney. The court did admit the fruits of the consent search following his arrest after finding Sims's consent was voluntary and given before any request for an attorney. The court also admitted the fruits of the other warrant searches.

The jury convicted Sims on all four counts. The district court, however, had doubts about whether the government had established real children were depicted in the images that Sims received and therefore entered a judgment of acquittal only as to Count Four. United States v. Sims, 220 F. Supp. 2d 1222 (D.N.M. 2002) ("Sims I"); see also United States v. Sims, 252 F. Supp. 2d 1255 (D.N.M. 2003) ("Sims II") (denying motion to reconsider refusal to acquit as to Count Three). The district court sentenced Sims to 37 months imprisonment and a $10,000 fine.

Before trial, the district court noted that "there was evidence presented that Mr. Sims suffers from brain deterioration." Sims's Presentence Investigation Report ("PSR") indicates on May 16, 2000, a neurologist conducting an independent medical examination diagnosed Sims with Frontotemporal Dementia

("FTD"), a form of dementia which causes a progressive loss of basic cognitive abilities.

Sims raises several issues on appeal. He alleges three violations of his Fourth Amendment rights; asserts that the Government failed to prove beyond a reasonable doubt that the images relied on in Count Three were images of "real children" and that his convictions for Counts One and Two should be reversed because they allege impossible acts; and claims several errors in his sentence.

The Government cross-appeals, arguing that the district court erred in reducing Sims's sentence based on an acceptance of responsibility adjustment and in its application of an aberrant behavior departure.

Finally, Sims has supplemented his arguments with a claim that the use of judicial fact finding to enhance his sentence violates his Sixth Amendment rights under United States v. Booker, 125 S.Ct. 738 (2005). Sims further argues that the court's application of the guidelines in a mandatory fashion is a non-constitutional error warranting re-sentencing.

## DISCUSSION

## I. FOURTH AMENDMENT ISSUES

We review the court's reasonableness conclusions under the Fourth Amendment de novo. United States v. Hernandez, 93 F.3d 1493, 1501 (10th Cir. 1996). However, we accept the trial court's findings of fact unless clearly erroneous. Id. We review a denial of a motion to suppress in the light most favorable to the United States as the prevailing party. United States v. Gordon, 173 F.3d 761, 765 (10th Cir. 1999).

### A. Facts

Sims raises three Fourth Amendment issues, which require a brief review of the facts to analyze. First, early investigation into this case by the FBI and local law enforcement included two warrantless searches. The first occurred on January 10, 2000, when an information systems security manager at Sims's place of employment searched Sims's office computer remotely through the server. The district court suppressed the fruits of this search, finding that it had been done solely at the behest of law enforcement and that, absent a warrant, it violated Sims's Fourth Amendment rights.

The second warrantless search was a nighttime search of Defendant's office and computer on January 11, 2000, conducted by Carlsbad police and two of Sims's co-workers. With some reservation, the district court accepted the

government's assertion that none of the information obtained on January 11 had been, or would be, relied upon. Therefore, the court denied that portion of Sims's motion to suppress as moot.

The source of the instant disputes are (1) whether Sims gave valid consent to search his car, personal belongings, and hotel room following his arrest; (2) whether the arrest and search warrants were supported by probable cause where the attached affidavits relied in part on the excluded fruits of the earlier warrantless searches; and (3) whether the search of Sims's office computer was illegal where the warrant was executed one day late.

## B.     Consent to search

A warrantless search is per se unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as valid consent. United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992). "Before a district court may admit evidence resulting from a consent search, it must determine from the totality of circumstances that (1) the defendant's consent was voluntary and (2) the search did not exceed the scope of the consent." U.S. v. Gutierrez-Hermosillo, 142 F.3d 1225, 1231 (10th Cir. 1998). Here, Defendant challenges only the voluntariness of his consent to search.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Therefore, "[w]hether voluntary consent was given is . . . reviewed for clear error." United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). The Government establishes voluntariness only if it (1) produces clear and positive testimony that the consent was unequivocal, specific, and freely given, and (2) proves that consent was given without duress or coercion, express or implied. Butler, 966 F.2d at 562.

Here, Sims points out that he was arrested at 4:05 p.m., transported to the FBI field station and placed in an interrogation room with two FBI agents and a corporal of the Missouri Highway Patrol where he was questioned "until 8:00 p.m." However, Sims points to no evidence of any coercive police conduct or the use of any physical force. Instead, Sims asks us to exclude the fruits of this search because Sims did not understand his rights, thought he had no choice but to sign the consent form, and signed the consent form "while also asking for a specific lawyer." He also argues his consent was involuntary because the district court found "evidence that Sims suffered from brain deterioration." According to Sims, this "made him unable to resist the pressure upon him at that time."

However, the district court specifically found that Sims signed the consent to search form <u>before</u> he invoked his right to counsel.[1]  Although there was conflicting testimony from Sims and law enforcement officers regarding the sequence of these events, "[e]valuation of the credibility of witnesses, the weight to be given the evidence, and inferences to be drawn from the evidence are for the district court."  <u>Hernandez</u>, 93 F.3d at 1498.  We see no reason to find the district court's understanding of events clearly erroneous.

Moreover, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."  <u>Bustamonte</u>, 412 U.S. at 227.  Indeed, this court has held that "consent to search may be voluntary even though the consenting party is being detained at the time consent is given, and law enforcement agents fail to advise him of his <u>Miranda</u> rights."  <u>United States v. Dozal</u>, 173 F.3d 787, 796 (10th Cir. 1999) (citations omitted) (collecting cases).

For this court, then, the most troubling issue is whether, given Sims's mental condition, his consent was nonetheless the "product of a rational intellect and a free will" and made with a "mental awareness so that the act of consent was that of one who knew what he was doing."  <u>United States v. Gay</u>, 774 F.2d 368,

_____

[1]On the other hand, the court did find that Sims's statement came <u>after</u> he requested an attorney, and therefore suppressed that statement.

- 11 -

377 (10th Cir. 1985).  This requires both understanding and judgment.  However, our cases have never required perfect mental ability to find a consent to search was voluntary.  E.g., id. at 376-77 (finding argument that consent was involuntary had "no merit" where defendant was so intoxicated he "was staggering and swaying as he walked" and slurred his speech but was able to answer officers' questions and produce his driver's license upon request); Gutierrez-Hermosillo, 142 F.3d at 1231 (affirming finding that 14-year-old girl gave voluntary consent to search).

Although the record in this case suggests that FTD is a degenerative disorder that could ultimately affect Sims's judgment, Sims has not pointed this court to any specific evidence of the extent of his impairment at the time of his consent to search.  Indeed, the officers testified that no aspect of Sims's dysfunction was apparent to them, and Sims's co-workers also testified they were not aware of Sims's illness prior to his arrest.  Indeed, Sims was cognizant enough to ask for an attorney before he made any statement to the police.  Moreover, the district court found no evidence that the police had attempted to exploit any of his vulnerabilities.[2]

---

[2]Certainly, if we were faced with assessing the voluntariness of Sims's confession following a Miranda warning, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" Colorado v. Connelly, 479 U.S. 157, 167 (1986).  In Connelly, the defendant was a chronic

(continued...)

Based on this evidence, we see no reason to conclude the district court's finding that Sims gave voluntary consent was clearly erroneous. Therefore, we AFFIRM the district court's ruling that this was a valid consent search.

## C.    Probable cause to issue warrants

The district court determined that the arrest warrant and the warrants obtained to search Sims's office, home computer, and the disks seized from Sims's luggage all relied in part on fruits from the illegal January 10, 2000, warrantless search of Sims's office. [3] Defendant argues these warrants were

---

[2](...continued)

schizophrenic who, at the time of his confession, was suffering a hallucination that the "voice of God" was commanding him to confess. Id. at 161. However, because the police were unaware of his condition and did not coerce the confession, the Court refused to suppress it. Id. at 167.

This police-perspective test has not yet been applied directly to a consent to search in any published circuit case this court has found. The D.C. Circuit considered the question and noted that "[i]f police coercion . . . is also a necessary predicate to the finding that a consent to search is not voluntary, then the subject's particular 'vulnerable subjective state' would be relevant only insofar as the police knowingly took advantage of the vulnerability in eliciting a consent to search." United States v. Hall, 969 F.2d 1102, 1108 n.6 (D.C. Cir. 1992).

We are not called on to answer this question in the instant case because we conclude Sims's consent was voluntary despite his brain disorder; however, we note that since Connelly our cases have continued to rely on the familiar "totality of the circumstances" test articulated in Bustamonte, 412 U.S. at 227.

[3]In this appeal, the Government argues that the district court's decision that this warrantless search was illegal was wrong in light of this court's subsequent decision in United States v. Angevine, 281 F.3d 1130 (10th Cir. 2002). In Angevine, we held that a university professor did not have any reasonable expectation of privacy in his office computer; however, we emphasized that this

(continued...)

irretrievably tainted by this information and, moreover, that the supporting affidavits were misleading because Agent Johnson never revealed her involvement in that warrantless search. Therefore, Sims seeks to have the fruits of these warrants, including the consent searches coming after his arrest warrant was executed, suppressed.

When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. Cusumano, 83 F.3d at 1250. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

"In determining whether probable cause supported the issuance of a search warrant, we give 'great deference' to the decision of the issuing magistrate or judge." Cusumano, 83 F.3d at 1250 (quoting United States v. Williams, 45 F.3d 1481, 1485 (10th Cir. 1995)). We review only whether the issuing magistrate or

---

[3](...continued)
issue requires a case-by-case analysis. Id. at 1134-35. We need not decide that issue here. See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996) (en banc) (holding that where a warrant is supported by probable cause absent some disputed information, we should not decide the constitutionality of the use of that disputed information based on the fundamental rule of judicial restraint).

- 14 -

judge had a "substantial basis" for finding probable cause, requiring "a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. (quotation omitted).

Here, in addition to the information coming from the warrantless office search, the affidavit contained detailed information about Sims's contacts with Mike Walker and the FBI's confirmation, after assuming the "sweetthingforyou16" identity, that Sims was planning to travel to meet Sue and Kate. The magistrate had information about the images sent to Walker, messages and images sent to the FBI, Sims's detailed plans to go to Missouri to meet Sue and Kate, and that Sims used both his home and office computers to send these messages.

In this case, the depth of the affidavit's specific information regarding Sims's suspected activity was more than sufficient to warrant suspicion and give the magistrate judge a reasonable ground to believe relevant evidence would be found. Accordingly, we AFFIRM the district court's ruling that the warrants here were based on probable cause without regard to the prior warrantless searches.

D. **Search warrant executed one day late**

Finally, Sims objects that the warrant issued for his office and office computer allowed a search "on or before" January 24, 2000, but was not executed until January 25, 2000. Defendant argues that because the warrant had expired by its own terms one day earlier, the search on January 25 was warrantless and violated Sims's Fourth Amendment rights. The district court declined to suppress the resulting evidence, concluding the error was not of a constitutional magnitude and not prejudicial.

"The Fourth Amendment does not specify that search warrants contain expiration dates." United States v. Gerber, 994 F.2d 1556, 1559 (11th Cir. 1993). However, the Federal Rules of Criminal Procedure require that a "warrant must command the officer to . . . execute the warrant within a specified time no longer than 10 days." Fed. R. Crim. Pro. 41(e)(2)(A).

In United States v. Pennington, 635 F.2d 1387 (10th Cir. 1980), we considered a violation of Rule 41's separate requirement that a federal search warrant be executed by federal officers and adopted a test that "violations of Rule 41 alone should not lead to exclusion unless (1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." Id. at 1389-90 (emphasis added, quotations omitted); see also United States v. Hugoboom, 112 F.3d 1081, 1087 (10th Cir.

1997) (declining to apply exclusionary rule to a warrant that magistrate neglected to limit to execution within a specific time frame given that the search was executed almost immediately after issuance and easily within the mandatory ten-day period); United States v. Gibson, 123 F.3d 1121, 1124-25 (8th Cir. 1997) (holding that a four-day delay between the issuance of the search warrant and its execution did not violate the "make immediate search" requirement on the face of the warrant where no police manipulation and probable cause survived when search did take place).

Although we are here dealing with a violation of the warrant itself, rather than a violation of Rule 41 per se, we find the same analysis applies to technical violations of the warrant. If non-prejudicial and unintentional violations of Rule 41 do not result in suppression, then *a fortiori* technical violations of the warrant itself compel the same result.

In this case, there was no showing that the one-day delay was the result of any intentional disregard of the terms of the warrant. Moreover, it was executed within the 10-day requirement of Rule 41, and there is no evidence the execution on January 25 rather than January 24 had any effect on the Government's probable cause to search Sims's office computer whatsoever. Indeed, we see no probable cause reason the search was limited to four days to start. As such, we affirm the district court.

## II. CONVICTION

Sims claims his conviction in Count Three should be reversed because the Government failed to prove that the images at issue depicted real children. He also asserts that his convictions under Counts One and Two should be reversed because they allege impossible acts.

### A. Images involving "real children"

As a threshold matter, we must determine the nature of the burden of proof involved in this offense. The statute Sims was convicted under penalizes any person who "knowingly transports . . . in interstate . . . commerce by any means including by computer . . . any visual depiction, if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and such visual depiction is of such conduct." 18 U.S.C. § 2252(a)(1). "Minor," in turn, "means any person under the age of eighteen years." Id. § 2256(1).

We agree with Sims that this statue requires the Government to prove, as an element of the offense, that the images at issue depict real minors engaged in sexually explicitly conduct—as opposed to virtual images of such conduct that do not depict actual children. This conclusion is evident from the face of the statute and is further supported by the Supreme Court's decision in Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002).

- 18 -

In Free Speech Coalition, the Court held that the Government can prohibit

non-obscene child pornography only to achieve "the State's interest in protecting

the children exploited in the production process." Id. at 240, 250 (citing New

York v. Ferber, 458 U.S. 747, 758 (1982)). Because no real children are used in

production of virtual child pornography, which instead uses youthful-looking

adult actors or computer-generated images, virtual child pornography is not

"speech that itself is the record of sexual abuse." Id. at 250. Therefore, the Court

held that a statute prohibiting images that only appeared to depict minors or

merely conveyed the impression of depicting minors was unconstitutionally

overbroad.[4] Id. at 258 (invalidating 18 U.S.C. §§ 8(B), (D) (2000)). Although

this same statute is not at issue in this case, the Court's reasoning supports our

conclusion that the Government must prove beyond a reasonable doubt that real

children are depicted in the images giving rise to a § 2252(a)(1) prosecution.

In this appeal, the parties dispute precisely how the Government must meet

this burden. Sims argues that the Government must either (1) identify the actual

---

[4]We note for the purpose of clarification that the Court in Free Speech Coalition expressly did not decide the constitutionality of "a more common and lower tech means of creating virtual images, known as computer morphing," which is the alteration of "innocent pictures of real children so that the children appear to be engaged in sexual activity." Id. at 242 (citing 18 U.S.C. § 2256(8)(C)). However, the Court noted that these morphed pictures "implicate the interests of real children" and therefore might be more likely to implicate the state's interest in protecting children from exploitation. Id.

child victim in the depiction or (2) prove, presumably through expert testimony, that the images were not computer generated.

However, our cases since Free Speech Coalition have consistently held that juries can review the images themselves to determine whether real children are depicted. Indeed, in United States v. Kimler, 335 F.3d 1132 (10th Cir.), cert. denied, 540 U.S. 1083 (2003), we considered a defendant's challenge to his conviction under the same statute at issue here on the ground that Free Speech "requires either direct evidence of the identity of children in the proscribed images or expert testimony that the images depicted are those of real children rather than computer generated 'virtual' children." Id. at 1140. The Government had introduced only the e-mails and images retrieved from the defendant and his computer. Id. at 1135-36. We concluded:

> Free Speech Coalition, did not establish a broad, categorical requirement that, in every case on the subject, absent direct evidence of identity, an expert must testify that the unlawful image is of a real child. Juries are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge.

Id. at 1142.

Although in Kimler we were specifically reviewing only for plain error, Kimler's underlying conclusion that the content of an image in many cases can speak for itself and suffice to prove that real children are depicted has been affirmed and applied in several subsequent cases. E.g., United States v. Riccardi,

405 F.3d 852, 870-71 (10th Cir. 2005) (experts not always necessary to assist juries in determining unidentified images depict actual minors); United States v. Cervini, 379 F.3d 987, 993 n.4 (10th Cir. 2004) (juries can determine "based on the image alone and without expert evidence, that the image is actual"); United States v. Harms, 371 F.3d 1208, 1213 (10th Cir. 2004) (explaining that "where no evidence suggests that the images are anything other than real, the government need offer no supporting evidence beyond the images themselves").[5]

Therefore, we hold that the Government has the burden of proving beyond a reasonable doubt that the images at issue in a § 2252 prosecution depict actual minors. However, this does not necessarily require expert testimony or identification of the actual child victims. See Kimler, 335 F.3d at 1142. Instead, juries often will be able to distinguish between real and virtual images, and "where no evidence suggests that the images are anything other than real, the government need offer no supporting evidence beyond the images themselves." Harms, 371 F.3d at 1213.

With this analysis of the Government's burden in mind, we turn to the issues of the instant case. On appeal, Sims argues (1) that there was insufficient

---

[5]In addition, several of our sister circuits have agreed. See, e.g., United States v. Deaton, 328 F.3d 454, 455 (8th Cir. 2003) (per curiam); United States v. Hall, 312 F.3d 1250, 1260 (11th Cir. 2002); see also United States v. Farrelly, 389 F.3d 649, 653 (6th Cir. 2004).

evidence of "real children" in his case and (2) that the jury was given an incorrect

instruction as to this element.[6]

_____

[6]At the outset, we note that Sims's trial was conducted under circumstances that concern this court. Prior to opening statements, outside the presence of the jury, the parties debated the nature of the Government's burden of proof on this real children issue. At that point, the district court instructed defense counsel:

> I'm not familiar with the case law on this issue. I'm not going to permit you to inject it in your opening statement, or to question on it. I will take a look at the case law on this issue sometime today and give you a ruling, but for purposes of opening statement, you will not be permitted to raise the question as to—or to challenge the issue as to whether they are real children or not.

Later, after analyzing the pre-Free Speech Coalition case law on point, the district court concluded—again outside the presence of the jury—that proof that the children depicted are real children "is not an element required by the Government to establish beyond a reasonable doubt."

Certainly, this was an inaccurate statement of the law at the time. See Sims I, 220 F. Supp. 2d at 1226 (recognizing error). Sims's inability to cross examine witnesses or discuss in his opening statement the real children issue raises real concerns about the fairness of Sims's trial. However, Sims does not claim any due process violation in his opening brief and instead asserts only the insufficiency of the evidence and jury instruction issues. Certainly, a defendant can waive a constitutional claim. See United States v. Green, 405 F.3d 1180, 1190-91 (10th Cir. 2005).

In addition, Sims's position at trial, as reflected in his proposed jury instruction on the point, was that if "the government has not proved that the images involved here are not computer-generated, then you must find Mr. Sims is not guilty." Indeed, Sims wanted to propose a jury instruction explaining the process of "morphing" innocent images of children into depictions of children engaged in sexually explicit conduct and noting that "[t]he technology of computer-imaging makes it difficult, if not impossible, to distinguish computer-generated from photographic depictions of child sexual activity."

Aside from attempting to inject this near-impossible burden on the Government to prove this negative, Sims has presented no evidence that would cast any doubt on the authenticity of the images at issue in this case whatsoever. Indeed, there is a total failure of proof as to what Sims's cross-examination of any

(continued...)

### 1.    Sufficiency of the evidence

Sufficiency of the evidence is a legal issue that we review <u>de novo</u>.  <u>United States v. Dashney</u>, 117 F.3d 1197, 1202 (10th Cir. 1997).  However, we will not reverse a jury verdict unless no jury, presented with the evidence introduced at trial together with the reasonable inferences to be drawn therefrom, could find the defendant guilty beyond a reasonable doubt.  <u>Id.</u>

Our review of this issue is significantly hampered by the fact that Sims selected only two of the e-mails, and the two sets of images attached to those e-mails for our review of the sufficiency of the evidence on Count Three.  The fact that Sims did not include all of the evidence in the record for our review is "virtually fatal" to his claim that there was insufficient evidence below.  <u>Kimler</u>, 335 F.3d at 1138.

<hr>

[6](...continued)
witness would have been or what it would have done to help Sims's case. Moreover, although Sims renewed his argument about the government's burden at the close of the Government's case, and immediately before closing arguments, Sims never renewed his objection when any witnesses were on the stand.  Absent a more definitive district court ruling, it is difficult to review any purported errors.  <u>See generally</u>  <u>United States v. Mejia-Alarcon</u>, 995 F.2d 982, 987 (10th Cir. 1993).  However, most fundamentally, absent any actual proffer of evidence or suggestion as to how specific witnesses could have assisted his case, it is essentially impossible to find prejudice.

Sims points out that the images he did designate are the same images the district court relied on when it found "substantial" evidence that real children were involved in Count Three and therefore denied Sims's motion for a judgment of acquittal on that count. However, we review a denial of a judgment of acquittal <u>de novo</u> in the light most favorable to the government and therefore are not bound only to rely on the images the district court used. See <u>Riccardi</u>, 405 F.3d at 870.

Based only on the secondhand descriptions of the evidence at trial, which is all that has been provided us, we are more than convinced a reasonable jury could have inferred from the images, and from Sims's statements regarding those images, that they depicted real children.

### 2.    Jury instructions

"The question of whether a jury was properly instructed is a question of law, and thus, our review is de novo." <u>United States v. Lee</u>, 54 F.3d 1534, 1536 (10th Cir. 1995). However, "[w]e review the district court's refusal to give a particular jury instruction for abuse of discretion." <u>Id.</u> "In assessing whether the court properly exercised that discretion, a reviewing court must examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence." <u>Id.</u>

Here, Sims asserts that the jury's instructions failed to inform the jury they had to find beyond a reasonable doubt that the images involved in Count Three depicted real children. However, the instruction given did articulate an accurate standard:

> The defendant can be found guilty of the offense charged in count 3 only if all of the following facts are <u>proved beyond a reasonable doubt</u>:
>> That on or about September, 1999, until and including January 22nd, 2000;
>> Second, the defendant knowingly transported or shipped a visual depiction in interstate or foreign commerce by any means, including by computer;
>> And third, <u>the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct</u>;
>> Fourth, that such visual depiction is of a minor engaged in sexually explicit conduct;
>> And fifth, that the defendant knew that such visual depiction was of sexually explicit conduct;
>> And sixth, the defendant knew that at least one of the persons engaged in sexually explicit conduct in such visual depiction was a minor.
> <u>A minor for purposes of this offense is a person under the age of 18.</u>

(Emphasis added). Before reading this instruction, the court also summarized the charge against Sims by saying he was accused of "knowingly transport[ing] . . . visual depictions of minors engaging in sexually explicit conduct which were produced using minors engaged in such conduct."

We have implied that a similar instruction requiring the jury to find that "the production . . . involves the use of a minor engaging in sexual activity"

- 25 -

would be proper after <u>Free Speech Coalition</u>.  <u>See</u> <u>United States v. Pearl</u>, 324 F.3d 1210, 1213 (10th Cir. 2003).

Although we agree that future instructions might be more clear on the requirement that the Government prove real children are depicted, this instruction accurately states the law.  Therefore, we affirm the district court.

### 3.    Conclusion

Accordingly, although this case certainly comes to us under unusual circumstances, based on the limited record before us, and the limited issues presented for our review, we AFFIRM Sims's conviction for Count Three.[7]

### B.    Impossible acts

In Count One, Sims was convicted for attempting to coerce and entice a minor to engage in sexual acts in violation of 18 U.S.C. § 2422(b).  In Count Two, Sims was convicted for traveling interstate for the purpose of engaging in sexual acts with a minor in violation of 18 U.S.C. § 2423(b).  There is no dispute both of these counts specifically involved "Kate," the fictitious 12-year-old persona assumed by Michael Walker, an adult male, and later the FBI.  Sims argues that because Kate does not exist, he could not be convicted of violating either statute because there was no actual minor involved, only adult men who

---

[7]Because we find no reversible error in Sims's Count Three conviction, we deny Sims's further argument that his trial on Counts One and Two was so tainted by Count Three that a new trial is warranted.

"communicated extensive fantasy with Walker misrepresenting . . . age and gender."

Initially, we see nothing impossible about traveling with a specific purpose, which the jury found beyond a reasonable doubt he did. Therefore, we reject Sims's claim as to Count Two as meritless. See United States v. Han, 230 F.3d 560, 562-63 (2d Cir. 2000) (discussing nature of offense).

Moreover, as to his Count One conviction for attempting to entice a minor, "[f]actual impossibility is generally not a defense to criminal attempt because success is not an essential element of attempt crimes." United States v. Hankins, 127 F.3d 932, 934 (10th Cir. 1997). We agree with our sister circuits that this general rule applies to the case at bar—that is, it is not a defense to an offense involving enticement and exploitation of minors that the defendant falsely believed a minor to be involved. United States v. Root, 296 F.3d 1222, 1227 (11th Cir. 2002); United States v. Farner, 251 F.3d 510, 512-13 (5th Cir. 2001); United States v. Meek, 366 F.3d 705, 717 (9th Cir. 2004). Therefore, we affirm Sims's convictions on these counts.

## III.    Sentencing

The Supreme Court's decision in United States v. Booker, 543 U.S. ----, 125 S.Ct. 738 (2005), has fundamentally changed the way defendants are sentenced.  However, even after Booker, district courts must still consult and take into account the Guidelines when sentencing.  United States v. Doe, 398 F.3d 1254, 1257 n.5 (10th Cir. 2005).  Moreover, when assigning sentences outside of the Guidelines-authorized range, district courts "should also continue to apply the Guidelines departure provisions in appropriate cases."  United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005).

Here, we consider a pre-Booker sentence.  "[W]e review legal questions de novo and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts."  Doe, 398 at 1257; see also United States v. Souser, 405 F.3d 1162, 1165 (10th Cir. 2005).

This case raises several sentencing issues.  Both Sims and the Government challenge the calculation of Sims's offense level and the district court's decisions regarding departures.  In addition, Sims claims the court erred in assessing a $10,000 fine.  Finally, Sims alleges the district court committed constitutional and non-constitutional Booker error.  Ultimately, we agree with the Government that the district court erred in applying acceptance of responsibility adjustment and in departing on the basis of aberrant behavior.  Therefore, we reverse and remand

for resentencing. Given this disposition, we need not address any of Sims's

Booker claims. See, e.g., Doe, 398 at 1257 n.5 & 6; United States v. Cano-Silva,

402 F.3d 1031, 1039 (10th Cir. 2005).

### A. Calculation of Guidelines range

### 1. Acceptance of responsibility

On cross-appeal, the Government argues that the district court erred in

granting Defendant a three-level acceptance of responsibility adjustment. The

district court found "that the defendant's confession at the time of the arrest . . .

is sufficient to establish acceptance of responsibility."

However, the application note to the acceptance of responsibility guideline

provides that this "adjustment is not intended to apply to a defendant who puts the

government to its burden of proof at trial by denying the essential factual

elements of guilt." U.S.S.G. § 3E1.1, appl. n.2. There are, however, "rare

situations" where a defendant may "demonstrate an acceptance of responsibility

for his criminal conduct even though he exercises his constitutional right to a

trial" such as "where a defendant goes to trial to assert and preserve issues that do

not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a

challenge to the applicability of a statute to his conduct)." Id. There, "a

determination that a defendant has accepted responsibility will be based primarily

upon pre-trial statements and conduct." Id.

Our cases make equally clear that acceptance of responsibility adjustments after trial are very rare. See United States v. Wooten, 377 F.3d 1134, 1145-46 (10th Cir. 2004); United States v. Salazar-Samaniega, 361 F.3d 1271, 1280-82 (10th Cir. 2004). Indeed, in the one case in which we approved the practice, the defendant "admitted to all the conduct with which he was charged" but "simply disputed whether his acknowledged factual state of mind met the legal criteria of intent" required by the applicable statute. United States v. Gauvin, 173 F.3d 798, 806 (10th Cir. 1999). To the contrary, where the defendant argued there was insufficient evidence to prove the factual element, the right to claim an acceptance of responsibility adjustment is forfeited. Salazar-Samangiega, 361 F.3d at 1281.

In this case, Sims did contest an essential factual element of the crime; therefore, an acceptance of responsibility adjustment is not available here. Although Sims responds on appeal that he went to trial to preserve First Amendment issues relating to the lack of evidence that the images at issue depicted real children, as well as certain "substantive constitutional issues . . . including the denial of several pre-trial motions," we are not convinced even this motivation would distinguish Sims's case from Salazar-Samangiega. Moreover, it is clear Sims did contest his factual innocence as to Counts One and Two. He argued that his conversations with "sweetthingforyou16" were nothing but sexual

fantasy, his purpose for traveling to Missouri was a business meeting, and he was trapped and provoked.

This is not the rare situation in which an acceptance of responsibility adjustment is available after a full jury trial. Because this clearly affected the district court's selection of the sentence imposed, we reverse and remand for resentencing. See Williams v. United States, 503 U.S. 193, 203 (1992).

## 2. Grouping

Next, Sims challenges the court's "grouping"of Sims's multiple counts in a manner that resulted in a two-level increase from an offense level of 31 to 33.[8] His essential arguments are that the district court erred by not grouping all of his

---

[8]When a defendant is convicted of multiple counts, the sentencing court determines a single base offense level by a process called grouping:

> Roughly speaking, when a defendant has been convicted of multiple counts, the Guidelines require the sentencing court to divide the counts into distinct groups of closely related counts, compute the offense level for each group, and then determine the combined offense level by increasing the highest offense level for any group by an amount based on the number of "units," which depends upon the number of groups with offense levels comparable to the highest level.

United States v. Jose-Gonzalez, 291 F.3d 697, 700 (10th Cir. 2002); see also U.S.S.G. ch. 3, pt. D. The Guidelines provide that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. Generally, counts involve substantially the same harm when they involve the same victim, transaction, or criminal objective; are measured based on the same quantity of a substance that is the basis for total harm; or share a specific guideline offense characteristic. Id.

counts together based on a single, shared harm to society in general and in creating two separate groups for attempting to entice both Sue and Kate when these girls were in fact the product of a single imagination and sexual conduct with Sue, 16, would not have been "prohibited."[9]

As to this first argument, we disagree with Sims that the only victim of his offenses was society. The guideline itself provides that society-at-large is the victim only where "there are no identifiable victims (e.g., drug or immigration offenses . . . )." U.S.S.G. § 3D1.2, appl. n.2. Here, Sims attempted to engage in sexual acts with specific minors, and if Sue and Kate had "been available, they, rather than society in general, would have been harmed." United States v. Butler, 92 F.3d 960, 963-64 (9th Cir. 1996). We agree with the Ninth Circuit in Butler that fictitious children, used as part of an undercover sting operation, may be treated as separate victims for grouping purposes.

---

[9]Sims also objects to the district court's application of a cross-reference to reach this original base offense level based on a finding that Sims traveled "for the purpose of producing a visual depiction" of a minor engaged in sexually explicit conduct. See U.S.S.G. § 2G1.1(c)(1). However, Sims's arguments here have no merit. The district court did not have to find that the singular purpose of Sims's trip was to produce child pornography, and there was more than sufficient evidence that this was a purpose of his trip. Sims sent e-mails to another adult saying he would send pictures of the girls when he returned, emailed Sue and Kate about taking pictures of them, and had at least three cameras in his possession when he was arrested at the roller-rink.

This conclusion is bolstered by the commentary to U.S.S.G. § 2G1.1, which has been amended since Sims's offense conduct to expressly define the victim of an enticement offense to "include an undercover law enforcement officer." U.S.S.G. § 2G1.1, appl. n.1; see also id. at app. C, amend. 592 (2001 manual) at 1074, 1083 (making amendment effective November 1, 2000). Although Sims argues this amendment is a substantive change that cannot be applied to him without violating the Ex Post Facto Clause, see United States v. Swanson, 360 F.3d 1155, 1166 (10th Cir. 2004), we disagree. In its reasoning statement for Amendment 592, the Commission did not discuss this addition to § 2G1.1 specifically but did say, in the context of a very similar addition in § 2A3.2, that several definitions were added "including clarifying that 'victim' includes an undercover police officer who represents to the perpetrator of the offense that the officer was under the age of 16 years." U.S.S.G., app. C, amend. 592 at 1082 (emphasis added).

In addition, we have already found another aspect of Amendment 592, which the Commission described as "clarif[ying] the meaning of the term 'item' . . . [and] adopt[ing] the holding of all circuits that have addressed the matter that a computer file qualifies as an item for purposes of the enhancement" to be clarifying. United States v. Thompson, 281 F.3d 1088, 1092-93 (10th Cir. 2002) (quotation omitted). As in Thompson, here the effect of Amendment 592 is to

- 33 -

create a guideline consistent with the existing precedent in <u>Butler</u> and to revise a commentary note rather than a guideline. In addition, the Commission has characterized it, at least in the explanation of a parallel change in § 2A3.2, as "clarifying." Therefore, we agree with the district court that the victims for the groups here at issue in Count One were the fictitious girls, not society at large.

As to Sims's alternative argument that his conduct as to Count One should not have resulted in separate groups for Sue and Kate, we find little merit.[10] Sims asserts that Sue and Kate were products of the same imagination and sexual conduct with a 16-year-old would not have been "prohibited."

We reject the idea that two fictitious victims from a single undercover operation must be treated as a single victim for grouping purposes. This is inconsistent with the reasoning of <u>Butler</u>, 92 F.3d at 963-64, which permitted three fictitious minor identities to be grouped as three separate victims.

We also reject Sims's argument that sexual conduct with 16-year-old Sue, as she was presented in the e-mail and instant message exchanges, would not have been prohibited. Prohibited sexual conduct is defined as "any sexual activity for

---

[10]As a matter of Guidelines application, we note that the Guideline for Count One expressly provides: "If the offense involved more than one victim, Chapter Three, Part D (Multiple Counts) shall be applied as if the promoting of commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction." U.S.S.G. § 2G1.1. Therefore, the fact that there are two groups for this single Count One conviction is consistent with the Guidelines.

which a person can be charged with a criminal offense" and includes "the production of child pornography." U.S.S.G. § 2G1.1 (cross-referencing to definition at § 2A3.1, appl. n.1). Although Sims asserts that the age of consent to sexual relations in the federal jurisdiction is 16, see 18 U.S.C. § 2243(a), the Guidelines definition is not so limited. Sims could have been charged with a multitude of offenses had he engaged in sexual conduct with Sue—including Missouri's second degree statutory rape offense. See Mo. Stat. Ann. § 566.034 (penalizing anyone over 21 having sex with someone under 17). Therefore, we find no error in the court's grouping in this case.

## B. Departure issues

The district court refused to depart on the grounds of diminished capacity or based on a combination of discretionary factors pushed by Sims. However, the court did depart down nine levels on the basis of aberrant behavior. Both sides appeal.

### 1. Jurisdiction

We have no jurisdiction to review a district court's "discretionary decision to deny a motion for downward departure on the ground that a defendant's circumstances do not warrant the departure." Sierra-Castillo, 405 F.3d at 936. Instead, our review extends only to "the very rare circumstance that the district court states that it does not have any authority to depart from the sentencing

guideline range for the entire class of circumstances proffered by the defendant."

United States v. Brown, 316 F.3d 1151, 1154 (10th Cir. 2003).

Here, Sims sought a departure on a combination of discretionary factors including victim misconduct, the likelihood of abuse in prison, and a combination of factors including Sims's unlikelihood of his recidivism, job loss, and age. The district court concluded a discretionary departure was not warranted on these grounds. Because the court clearly knew it had authority to depart on these grounds but simply elected not to do so in this case, we cannot entertain these issues on appeal.

On the other hand, in denying the diminished capacity departure, the district court explained that Sims was "not qualified, and is therefore, ineligible for a departure based on diminished capacity, because [Sims's] offense conduct involves a serious threat of violence. The Court views this fact as disqualifying it from permitting a reduction based on diminished capacity." Therefore, we have jurisdiction to review this specific denial of a departure. See, e.g., United States v. Mitchell, 113 F.3d 1528, 1535-36 (10th Cir. 1997).

### 2. Diminished capacity

The diminished capacity policy statement permits a sentence below the applicable guideline range if the defendant suffered from a significantly reduced mental capacity. U.S.S.G. § 5K2.13. "However, the court may not depart below

the applicable guideline range if . . . the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." Id.

Upon Defendant's motion for a departure based on diminished capacity in this case, the district court noted that "the defendant has established by a preponderance of the evidence that his dementia significantly impaired his mental abilities." However, the district court believed Sims was ineligible for such a departure because the "offense involved actual violence or a serious threat of violence."

Section 5K2.13 does not define which offenses, or what offense conduct, involve actual violence or a serious threat of violence. However, in United States v. Constantine, we found it obvious that a threat of violence was "inherent" in a conviction for possession of a firearm, and that the diminished capacity guideline was therefore inapplicable in that case. 263 F.3d 1122, 1126 (10th Cir. 2001). Other potentially violent crimes to which this bar has been applied include bank robberies, threatening communications, and kidnapping. See Andrew M. Campbell, Annotation, Downward Departure under § 5K2.13 of United States Sentencing Guidelines, 128 A.L.R. Fed. 593 §§ 20-24.

We have found no "clear or obvious error" where a district court determined that both enticing a minor and traveling for the purpose of engaging in

- 37 -

sexual acts with a minor are crimes of violence under the definition in 18 U.S.C. § 16. United States v. Johnson, 183 F.3d 1175, 1179 (10th Cir. 1999). The Sixth Circuit has also held that enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction is a crime of violence under U.S.S.G. § 4B1.2 because it presents a serious potential risk of physical injury. United States v. Champion, 248 F.3d 502, 506 (6th Cir. 2001). Moreover, the commentary for § 2A3.1, the guideline Sims was sentenced under for Count Two (traveling with intent to engage in sexual conduct with a minor), specifically states: "Sexual offenses addressed in this section are crimes of violence. Because of their dangerousness, attempts are treated the same as completed acts of criminal sexual abuse."[11] Id. § 2A3.1, appl. n.5.

Based on this, we easily agree with the district court that Sims's offenses included a serious threat of violence. Therefore, a departure based on diminished capacity is not permissible under the guidelines.

---

[11]Indeed, we have regularly held crimes involving sexual contact with minors to be crimes of violence. See, e.g., United States v. Rowland, 357 F.3d 1193, 1197-98 (10th Cir. 2004) (affirming "crime of violence" classification under § 4B1.2 where "Oklahoma's statutory definition of sexual battery presents the serious possibility of risk of physical injury") (citations omitted); United States v. Vigil, 334 F.3d 1215, 1223-24 (10th Cir. 2003) (concluding risk of injury "inherent" in Colorado's aggravated incest offense makes it a crime of violence under § 4B1.2 even though, like arson or burglary, there might be some cases where incest occurs without actual physical injury).

### 3. Aberrant behavior

Finally, we consider the district court's decision to depart downward nine levels on the basis of aberrant behavior.[12] The guideline provides that "[a] sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. . . . 'Aberrant behavior' means a single criminal occurrence or single criminal transaction . . . without significant planning[,] . . . of limited duration[, and that] represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20 & appl. n.1. The commentary specifically include a defendant's "record of prior good works" and "motivation for committing the offense" as proper circumstances to consider in departing on these grounds. Id. at appl. n.1. However, the departure requires more than just the absence of a prior criminal record. United States v. Benally, 215 F.3d 1068, 1074 (10th Cir. 2000).

In deciding to depart here, the district court emphasized Sims's (1) medical condition, (2) long history of living an "exemplary" law-abiding life, (3) significant support from family and friends, (4) prior history of close relationships

___

[12]Both the Government and Sims object to the size of this departure. Predictably, the Government asserts it was unreasonably large while Sims claims it was too small where the district court earlier suggested it would depart ten levels. Because we ultimately conclude the aberrant behavior departure was not warranted at all, we do not reach these issues of degree.

with children without any sexual abuse reports, and (5) continued good behavior subsequent to his arrest. However, the Government asserts that Sims is not qualified for such a departure because he distributed pornographic images on the Internet for almost a year and spent months planning his trip to Missouri to meet Sue and Kate.

Certainly, we can agree with the district court's finding that Sims's criminal behavior represented "a marked deviation by the defendant from an otherwise law-abiding life." However, we simply cannot decipher how Sims's well-planned, detailed scheme over the course of several months to entice and rendevous with minor girls, as well as what seems to be repeated distribution of child pornography, was a "single criminal occurrence or single criminal transaction . . . without significant planning [and] of limited duration." In cases with similar facts, courts have not permitted such a departure. E.g., United States v. Orrega, 363 F.3d 1093, 1097-98 (11th Cir. 2004) (no aberrant behavior departure where defendant convicted of enticing minor to engage in sexual acts where defendant had two 90-minute online conversations, almost one month apart, with undercover agent posing as 13-year-old girl, during which he requested that they engage in sexual acts, he sent naked picture of himself to agent, arranged meeting place, and drove to meeting place).

Furthermore, here we cannot consider Sims's mental condition as a grounds for a diminished capacity departure because the crime involves a risk of violence, and we cannot agree that the Guidelines permit the use of aberrant behavior as an end run around this limitation. Therefore, giving Sims's extended planning and enticement of Sue and Kate, combined with frequent distribution of child pornography, we must reverse this departure.

## C.    Fine

Finally, Sims objects to the court's imposition of a $10,000 fine. Although Sims did make some objections to the PSR's asset calculation, Sims did not object to any fine-related issue at the sentencing hearing. Therefore, we review this fine for plain error.

Sims's current financial situation does appear to be problematic, as he lost his engineering job in New Mexico and, according to Sims's own objection to the PSR, "was not represented by counsel in his divorce proceedings and his former wife was left with all the assets and defendant ended up with only the debts." The PSR also notes, however, that "[a]ccording to the defendant, he and his ex-wife chose to divorced [*sic*] for financial purposes; however, they continue to reside together as a family." Moreover, prior to the divorce, Defendant "reported having various trust and retirement accounts which had an aggregated value of one million dollars."

We are struck by the fact that Defendant appears to have concealed assets by getting a divorce for financial purposes    .  Given these suspicious circumstances, we cannot say the district court committed plain error in setting the fine at $10,000 in this case.  Therefore, we affirm this fine.

## IV.    Conclusion

We AFFIRM Sims's convictions and the district court's pre-trial rulings in this case.  We REVERSE the district court's sentence as to the acceptance of responsibility adjustment and the aberrant behavior departure.  We REMAND with instructions to vacate Sims's sentence and to resentence under advisory Guidelines.  Therefore, we do not reach Sims's Booker claims.[13] [14]

---

[13]Before this court is also Sims's motion to strike portions of the Government's brief referencing Sims's suppressed confession and a pending civil proceeding unrelated to the instant case.  Because we have not relied on any of the contested information in reaching this decision, we deny Sims's motion.  Sims also requested additional oral argument on the Booker issues in this case. Because we do not need to reach those issues here, we DENY that request.

[14] Sims' Motion to Supplement the Record on Appeal is granted.