FILED
United States Court of Appeals
Tenth Circuit

July 29, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff – Appellee,

v.

VICTOR CHAVEZ,

      Defendant – Appellant.

No. 07-2008

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:06-CR-00264-MCA)**

Arturo B. Nieto, Albuquerque, NM, for Defendant-Appellant Victor Chavez.

Gregory J. Fouratt, Assistant United States Attorney (Larry Gomez, Acting United States Attorney, with him on the brief) for Plaintiff-Appellee United States of America.

Before **HARTZ, EBEL** and **TYMKOVICH**, Circuit Judges.

**EBEL**, Circuit Judge.

During a search of Defendant-Appellant Victor Chavez's pick-up truck, a New Mexico State Police patrolman discovered approximately 1 kilogram of cocaine in a bucket covered with nails.  Mr. Chavez eventually entered a

conditional guilty plea to one count of conspiracy to commit possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B) and 846, and one count of possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B). He conditioned his plea on the right to challenge on appeal the district court's decision not to suppress the narcotics evidence as fruits of an illegal stop and search.

The patrolman who pulled Mr. Chavez over was instructed to do so by a Drug Enforcement Agency ("DEA") task force officer. Prior to the traffic stop, a DEA task force had investigated and conducted surveillance of Servando Moreno, the passenger in Mr. Chavez's pick-up at the time of the stop. More to the point, the DEA had, through a confidential source, arranged to purchase 1 kilo of cocaine from Mr. Moreno on the day of the stop. Based on its investigation, the DEA directed the patrolman to stop and search Mr. Chavez's vehicle. Mr. Chavez contends that the *patrolman* lacked probable cause because he was not privy to the details of the DEA investigation. The central question presented here is whether the patrolman's stop and search of Mr. Chavez's vehicle was justified under the "collective knowledge" doctrine. We conclude that it was. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. The Sting

After a months-long investigation, the DEA set in motion a sting operation targeting Mr. Moreno on January 18, 2006. Serving as an intermediary, a confidential source ("CS") who had previously proven to be reliable,[1] made a series of monitored telephone calls[2] to Mr. Moreno and indicated that a buyer from Amarillo, Texas, was interested in purchasing 1 kilo of cocaine. As negotiated by Mr. Moreno and the CS, the transaction was to occur at a truck stop in Santa Rosa, New Mexico (a location between Amarillo and Albuquerque). When Agent Maudlin spoke with the CS on the evening of January 18, the CS confirmed the location, price, and other logistical details of the drug deal, and also noted that Mr. Moreno had indicated that "he was going to get a driver to take him" from Albuquerque to Santa Rosa.[3]

---

[1]During the suppression hearing, Agent Jeff Maudlin and DEA Task Force Officer ("TFO") Jeramy Melton averred that the CS had proven himself reliable during past investigations. The district court found this testimony credible.

[2]On January 19, the CS spent the day with TFO Melton in a secure location. Melton monitored each communication between the CS and Mr. Moreno during the course of the day, and reported the content of those communications to his fellow task force officers.

[3]While Mr. Moreno refused to tell the CS the driver's name, he did give the CS the driver's telephone number. Agent Maudlin cross-checked the number and learned it was assigned to Victor Chavez.

## B. The Surveillance

The next morning, January 19, Agent Maudlin and Task Force Officer ("TFO") James Mowduk staked out Mr. Moreno's trailer home in Albuquerque. Around 9:20 a.m., the CS called Mr. Moreno to check on the status of the deal, and Mr. Moreno indicated that the deal was on, but that he was still at home. Just a few minutes later, a man matching Mr. Moreno's description left the trailer carrying a small duffel bag, got in a burnt orange truck customarily driven by Moreno, and drove to 319 Riverside, a home located in the South Valley area of Albuquerque. The DEA agents followed the burnt orange pick-up to the Riverside residence. After arriving at 319 Riverside, the orange truck disappeared behind a stucco fence paralleling a driveway that led behind the house.

Approximately fifteen minutes later, a white pick-up truck left 319 Riverside. The DEA agents followed the truck to a gas station, where they ascertained that two individuals were in the truck. One matched Mr. Moreno's description and the other, as it turned out, was Mr. Chavez. While the white truck was at the gas station, the DEA team instructed the CS to telephone Mr. Moreno again. Mr. Moreno told the CS that he was just leaving Albuquerque en route to Santa Rosa. A few minutes later, the two individuals left the gas station, headed north on I-25, and then took eastbound I-40 towards Santa Rosa. The DEA

agents, including Agent Maudlin and TFO Mowduk, continued their surreptitious pursuit.

**C. The Stop**

As members of the DEA task force followed the white pick-up onto I-40, TFO Mowduk called Patrolman Arcenio Chavez,[4] a canine officer with the New Mexico State Police. The day before, in preparation for the sting operation, TFO Mowduk had confirmed with Patrolman Chavez that Chavez would be on duty the following day with his canine partner, Chica. TFO Mowduk then informed him that the DEA task force wanted him to perform a traffic stop the next day.

During their conversation on the morning of January 19, TFO Mowduk provided Patrolman Chavez with the "plate number, the vehicle description, the number of occupants," and a description of the white pick-up truck that the DEA wanted him to stop. TFO Mowduk also advised the patrolman that he would have to develop his own probable cause for stopping the vehicle because the occupants were wearing seat-belts and appeared to be observing traffic laws. Lastly, in response to Patrolman Chavez's queries, TFO Mowduk stated that the white pick-up was carrying "coke" and that he didn't know whether the occupants were armed.

---

[4]There is no indication in the record that Patrolman Chavez is related to the Defendant-Appellant.

When TFO Mowduk called, Patrolman Chavez was waiting on the median of I-40 east of Albuquerque. He eventually located the white pick-up, and engaged his emergency equipment.[5] After the white pick-up truck pulled over, a charade of sorts took place. Patrolman Chavez pretended that he had stopped Mr. Chavez for failing to turn on his headlights in a safety corridor – a failure that the patrolman in fact believed at the time of the stop was an infraction of New Mexico's regulations.[6] As such, he followed his routine traffic stop procedure, asking first for Mr. Chavez's license, registration, and proof of insurance. Patrolman Chavez filled out a citation for the headlight infraction and for Mr. Chavez's failure to provide proof of insurance. After asking Mr. Chavez and Mr. Moreno routine questions about their travel plans, Patrolman Chavez returned Mr. Chavez's license and registration and stated that Mr. Chavez and Mr. Moreno were free to leave.

---

[5]The patrolman's police car was equipped with a recording camera, and a video was made of the traffic stop. Neither party adduced either the videotape or the transcript of that tape as part of the Record on Appeal.

[6]Patrolman Chavez testified that, throughout the course of the traffic stop, he believed he had probable cause to search the pick-up based on the DEA's statement that there was cocaine in the truck. He pursued the pretense – asking for Mr. Chavez's documents, asking where Mr. Chavez and Mr. Moreno were going, writing the citation, asking for consent to search the vehicle – to comply with the DEA's request that he not reveal information about their investigation. At no point during the stop did Patrolman Chavez inform Mr. Chavez and Mr. Moreno that they were under investigation for drug trafficking.

**D. The Search**

Before Mr. Chavez could drive off, however, Patrolman Chavez asked Mr. Chavez if he would answer some more questions. During this colloquy, the patrolman asked for permission to search the truck. Mr. Chavez queried what would happen if he did not consent; Patrolman Chavez responded that he would have Chica sniff the truck before letting them go. Eventually, Mr. Chavez consented to the search, and both Mr. Chavez and Mr. Moreno signed standardized consent forms that were written in both English and Spanish. During the subsequent search, Patrolman Chavez discovered a packet of a substance that was later confirmed to be cocaine in a bucket of nails on the truck's bed. He then arrested both Mr. Chavez and Mr. Moreno. All told, the traffic stop and search lasted about 30 minutes.

**E. The Secrecy**

The DEA task force opted to involve Patrolman Chavez – and to request that he develop his own rationale for stopping the truck – to maintain the secrecy of its investigation. Agent Maudlin testified that Patrolman Chavez was given minimal information to protect the integrity of the DEA investigation and the identity of the CS. By having a New Mexico State Police officer pull Mr. Moreno over, the DEA task force hoped to convince the traffickers that the stop was a random occurrence.

**F. The Suppression Decision**

On February 7, 2006, Mr. Chavez was indicted on one count of conspiracy to commit possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B) and 846, one count of possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B), and one count of aiding and abetting, in violation of 18 U.S.C. § 2. Mr. Chavez and Mr. Moreno submitted a joint motion to suppress evidence, and the district court held a suppression hearing on August 29 and August 31, 2006. After Judge Armijo rejected the motion to suppress in a Memorandum Opinion and Order dated September 8, 2006, Mr. Chavez entered a conditional guilty plea to the first and second counts (conspiracy and possession). On appeal, Mr. Chavez renews his Fourth Amendment objections to the traffic stop and the search.

## II.    DISCUSSION

### A. Standard of Review

In assessing a denial of a motion to suppress, this court "accept[s] the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous." United States v. Herrera, 444 F.3d 1238, 1242 (10th Cir. 2006) (quotation omitted); United States v. Cervine, 347 F.3d 865, 868 (10th Cir. 2003). Moreover, this court "review[s] the evidence in the light most favorable to the government." United States v. Patterson, 472 F.3d 767, 775

(10th Cir. 2006). Ultimately, however, this court must review de novo the reasonableness of the government's action under the Fourth Amendment. Herrera, 444 F.3d at 1242. The government bears the burden of proving the reasonableness of the search or seizure. Id.

**B. Merits**

Mr. Chavez asserts that Patrolman Chavez unlawfully stopped and searched his pick-up because (1) the DEA had evidence of Mr. Moreno's criminal conduct but no individualized evidence regarding Mr. Chavez, and (2) TFO Mowduk never communicated the information constituting probable cause to Patrolman Chavez, rendering Patrolman Chavez's reliance on the instructions to stop and search the truck unreasonable.[7] As such, Mr. Chavez argues that the district court should have excluded all evidence derived from the traffic stop.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.[8] Although a traffic stop is typically brief, it is a "seizure" within the meaning of the Fourth Amendment. Delaware v. Prouse,

---

[7]Mr. Chavez has standing to challenge the search and seizure because he has a reasonable expectation of privacy in the area that Patrolman Chavez searched, the bed of the pick-up he owned. See United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995); cf. United States v. DeLuca, 269 F.3d 1128, 1131-32 (10th Cir. 2001) (noting that passengers "without a possessory or property interest in the vehicle searched" lack standing).

[8]Mapp v. Ohio, 367 U.S. 643 (1961), incorporated this protection against actions by state governments.

440 U.S. 648, 653 (1979).  Because routine traffic stops are "more analogous to an investigative detention than a custodial arrest," the principles set forth in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), guide this court's analysis of the reasonableness of the traffic stop.  <u>See</u> <u>United States v. Hunnicutt</u>, 135 F.3d 1345, 1348 (10th Cir. 1998).  Thus, we examine whether the traffic stop was (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  <u>United States v. Botero-Ospina</u>, 71 F.3d 783, 786 (10th Cir. 1995) (en banc) (quoting <u>Terry</u>, 392 U.S. at 20).

The police may stop a car if they have probable cause or a reasonable, articulable suspicion to believe the car is carrying contraband.  <u>See</u> <u>United States v. Cortez-Galaviz</u>, 495 F.3d 1203, 1205-06 (10th Cir. 2007) ("[A] traffic stop will be held reasonable when, under the totality of the circumstances, the officer bears a 'reasonable suspicion' that criminal activity 'may be afoot.'" (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002)); <u>United States v. Stone</u>, 866 F.2d 359, 362 (10th Cir. 1989) (citing <u>United States v. Sharpe</u>, 470 U.S. 675, 682 (1985)).  This court looks only at whether the stop was "objectively justified"; the officer's subjective motives are irrelevant.  <u>United States v. DeGasso</u>, 369 F.3d 1139, 1143 (10th Cir. 2004).

Because Mr. Chavez's first argument stands or falls on the result of his second, we turn at the outset to the latter argument.[9]  In Cervine, this court left open the question whether, "absent any traffic violation," a reasonable, articulable suspicion (or probable cause) of illegal activity communicated to the stopping officer by other law enforcement officers would suffice to permit a traffic stop. Cervine, 347 F.3d at 870 n.6.[10]  This question is squarely before the court now.[11] A natural extension of United States v. Zamudio-Carrillo, 499 F.3d 1206 (10th Cir. 2007), answers the question and forecloses Mr. Chavez's arguments about the unlawfulness of the traffic stop and subsequent search.

We will analyze this initial issue in two steps, asking first whether the DEA task force agents had probable cause to believe Mr. Chavez's vehicle contained

[9]Mr. Chavez's first argument– that the DEA's investigation targeted only Mr. Moreno and that the DEA agents thus lacked individualized information regarding Mr. Chavez – is foreclosed by Stone so long as (1) the DEA task force had probable cause and (2) that probable cause could be imputed to Patrolman Chavez.  See Stone, 866 F.2d at 362 ("Police may stop and detain an automobile and its occupants if they have an articulable and reasonable suspicion that the car is carrying contraband." (emphasis added)).  At the time he was stopped, Mr. Chavez was driving a truck the DEA task force believed – because of the investigation of Mr. Moreno – had a kilo of cocaine in it.  For the reasons discussed below, we conclude that Mr. Chavez's first argument falters.

[10]The Cervine court left the question open because the government did not "argue that the troopers stopped Mr. Cervine based on the objective, reasonable, and articulable suspicion of drug trafficking as communicated to them by the DEA."  347 F.3d at 870 n.6.

[11]In fact, the government never advanced the argument that Patrolman Chavez was actually stopping Mr. Chavez in an attempt to enforce New Mexico's traffic laws.

narcotics.  They did.  Second, we query whether the DEA task force's probable cause could be imputed to Patrolman Chavez.  It could, in light of Zamudio-Carrillo and precedent from our sister circuits.  Accordingly, we agree with the district court's conclusion that Patrolman Chavez, acting on the strength of the DEA task force's information, was objectively justified in initiating the stop and in searching the truck.

1.  Probable Cause

Here, the government relies on the information derived from the DEA's investigation to justify both the stop of Mr. Chavez and the search of his truck. As noted above, an officer may stop a car if he has either a reasonable, articulable suspicion or probable cause to believe that the car is carrying contraband.  See Cortez-Galaviz, 495 F.3d at 1205-06.  "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence."  United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001) (quoting United States v. Downs, 151 F.3d 1301, 1303 (10th Cir. 1998)); cf. Ornelas v. United States, 517 U.S. 690, 696 (1996).

Based on a credible confidential source's communication with Mr. Moreno and the task force's ongoing surveillance of Mr. Moreno, the DEA task force – specifically Agent Maudlin and TFO Mowduk – knew that: (1) Mr. Moreno had agreed to sell 1 kilo of cocaine to a buyer at a truck stop in Santa Rosa on January

- 12 -

19; (2) Mr. Moreno planned to have someone drive him to Santa Rosa; (3) a man matching Mr. Moreno's description and driving an orange truck customarily driven by Mr. Moreno left Mr. Moreno's trailer home and drove to 319 Riverside; (4) a white pick-up left that address with two occupants, one of whom appeared to be the man who left Mr. Moreno's trailer in the orange truck; (5) Mr. Moreno then told the confidential source that he was en route to Santa Rosa with a driver to complete the drug deal; and (6) the white pick-up took the interstate that connects Albuquerque with Santa Rosa. As the district court held, this evidence suffices to support the conclusion that the DEA task force had probable cause to believe that Mr. Chavez's pick-up contained the kilo of cocaine.

The "automobile exception" to the warrant requirement permits law enforcement officers who have "probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant." United States v. Beckstead, 500 F.3d 1154, 1165 (10th Cir. 2007); see also California v. Carney, 471 U.S. 386, 392 (1985). Once the officer's suspicions rise to the level of probable cause, they are empowered to search "the entire vehicle, including the trunk and all containers therein that might contain contraband." United States v. Bradford, 423 F.3d 1149, 1160 (10th Cir. 2005).

Therefore, the DEA task force officers with knowledge of the above-listed facts would have been within the Fourth Amendment's reasonableness bounds had they searched Mr. Chavez's pick-up.

2.  Collective Knowledge

The next issue is whether the information known to TFO Mowduk and other members of the DEA task force can be imputed to Patrolman Chavez.  That is, this court must decide whether a police officer may rely on the instructions of another law enforcement agency or officer to initiate a traffic stop and then conduct a search pursuant to the "automobile exception."

This question implicates the "fellow officer" rule, also known as the "collective knowledge" doctrine.  This doctrine can be conceptualized using two categories: "horizontal" collective knowledge and "vertical" collective knowledge.  The first category subsumes situations where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause.  See United States v. Shareef, 100 F.3d 1491, 1503-05 (10th Cir. 1996).  In such situations, the court must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.  See id. at 1504-05; see also United States v. Maestas, 2 F.3d 1485, 1493 (10th Cir. 1993).  This case, on the other hand, implicates the second category; it is a situation where one officer *has* probable cause and instructs another officer to act, but does not communicate the corpus of

information known to the first officer that would justify the action.[12]  We review

now the precedents applying this "vertical" variety of collective knowledge.

In United States v. Hensley, 469 U.S. 221, 231 (1985), the Supreme Court

noted that "when evidence is uncovered during a search incident to an arrest in

reliance on a flyer or bulletin, its admissibility turns on whether the officers who

*issued* the flyer possessed probable cause to make the arrest."  There, police

officers had initiated a Terry stop of the defendant in reliance on a "wanted

flyer."  Id. at 223-24.  On the facts before it, the Court concluded that, so long as

the officers that issued the flyer had a reasonable suspicion about the person it

targeted, "then reliance on that flyer or bulletin justifies a stop to check

identification, to pose questions to the person, or to detain the person briefly . . .

."  Id. at 232 (internal citations omitted).

Logically, the Hensley holding approaches a rule that would allow us to

impute the DEA's knowledge to Patrolman Chavez.  However, Hensley addressed

a Terry stop situation (and not a full-on search pursuant to the automobile

exception).  Dicta in Whiteley v. Warden, 401 U.S. 560 (1971), similarly supports

this conclusion.  There, the Supreme Court suggested in dicta that an arresting

officer could rely on an arrest warrant obtained by another law enforcement

---

[12]Of course, the officer who has probable cause may possess that
information as a result of communication from other officers.  Thus, the
"horizontal" and "vertical" collective knowledge categories are by no means
mutually exclusive.

- 15 -

agency.  Id. at 568.  However, that statement was not dispositive to the issues here because it dealt with an arrest warrant issued by a magistrate and the holding of Whiteley was that the underlying warrant itself was defective, thereby mandating the suppression of the evidence obtained by the second, arresting officer.  Id. at 568-69.  The missing link then is whether an officer, like Patrolman Chavez, who was not intimately involved in an investigation can rely on the collective knowledge of the investigators to stop and search a vehicle when justifiable conclusions of the collective investigation are conveyed to him. Zamudio-Carrillo substantially supplied that link.

In Zamudio-Carrillo, this court addressed a situation where one state trooper, Trooper Rule, observed two Ford SUVs with sequentially numbered Arizona specialty plates driving along I-70 in Kansas.  499 F.3d at 1207-08. Trooper Rule also noticed that one of the vehicles, a Ford Explorer, appeared to have a false floor compartment under its rear wheel well.  Id. at 1208.  After pulling the Explorer over, Trooper Rule "confirmed the presence of a false compartment."  Id.  He then "contacted dispatch and asked them to send an officer to locate" the other Ford SUV.  Id.  A second state trooper, Trooper Harvey, "pulled up to Rule's location and Rule gave him a brief description" of the other Ford SUV.  Id.  Trooper Harvey then tracked down the vehicle, stopped it, and arrested the driver.  Id.

The driver of the second vehicle, Zamudio-Carrillo, argued that Trooper Harvey's action – taken in reliance on Trooper Rule's "brief description" – violated the Fourth Amendment. Id. at 1209-10. This court disagreed. Id. at 1210. We concluded that "the discovery of a false compartment in the Ford Explorer coupled with objective information indicating [the Explorer's driver] was traveling in tandem with Zamudio-Carrillo gave Trooper Harvey probable cause to stop and seize Zamudio-Carrillo." Id. at 1209. It is not clear from the discussion in Zamudio-Carrillo whether Trooper Rule communicated to Trooper Harvey the basis for his suspicions about the Ford Explorer or just Trooper Rule's conclusion that he believed the Ford Explorer was involved in drug trafficking. Because the Zamudio-Carrillo court did not explicitly discuss the details of the communication between Rule and Harvey, we will delve a bit deeper.

Extrapolating from Hensley, those circuits that have addressed squarely the issue presented here have held that a police officer may rely on the instructions of the DEA (or other law enforcement agencies) in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause. See United States v. Ramirez, 473 F.3d 1026, 1037 (9th Cir. 2007) ("Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.");

- 17 -

United States v. Williams, 429 F.3d 767, 771-72 (8th Cir. 2005) ("[W]e also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop [the co-defendant's] vehicle, and such knowledge was imputed to the officer at the scene when he received [another officer's] radioed request."); United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002) ("[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause."); United States v. Ibarra-Sanchez, 199 F.3d 753, 758-59 (5th Cir. 1999); United States v. Celio, 945 F.2d 180, 183 (7th Cir. 1991).[13]

Ignoring these precedential obstacles, Mr. Chavez cites Shareef for the proposition that Patrolman Chavez could not act on TFO Mowduk's instructions unless Mowduk communicated the substance of the DEA's suspicions. His reliance on Shareef is misplaced. In Shareef, one police officer had stopped a car and communicated with the driver, meanwhile another officer had conversed with the dispatcher, who provided a physical description (the weight and height) of a

---

[13]Of course, these cases note that there must be some communication between the officer or officers with probable cause and the officer who executes the stop or search. This communication confirms that the officers are functioning as a team. See Ramirez, 473 F.3d at 1036; United States v. Rodriguez, 831 F.2d 162, 166 (7th Cir. 1987) (noting that where a DEA agent points out specifically what car another officer should stop that officer acts merely "as an 'extension' or agent of the DEA agent").

- 18 -

man wanted by authorities elsewhere. Id. at 1503-04. Because those two officers never shared their respective quanta of information, this court held that the fact that the driver's physique matched the wanted man's physical description could not be considered as a factor in reviewing the objective reasonableness of either officers' actions. Id. at 1504-05. The Shareef court thereby rejected a rule that information known, individually, to officers is pooled (as if they were one sentient law-enforcing organism) even absent any evidence of communication.

Here, however, the aspects of the DEA investigation that are pertinent to the probable cause inquiry were known to TFO Mowduk, the officer who asked Patrolman Chavez to stop Mr. Chavez's vehicle. Rather than a horizontal pooling of discrete pieces of information, one officer here (Mowduk) had all the requisite probable cause components; the question then is whether that information can be imputed vertically to another officer (Patrolman Chavez). As explained above, our sister circuits have extrapolated from Hensley and upheld this latter application of the collective knowledge doctrine. Moreover, Zamudio-Carrillo counsels the identical result.

Accordingly, we conclude, as did the district court, that Patrolman Chavez acted on the strength of the DEA's probable cause when he stopped and searched Mr. Chavez's truck. He merely supplied a cover story (the putative headlight infraction) that would mask the basis for his alternative probable cause (the drug trafficking). "[D]isguising the stop as a 'traffic stop' was a valid law

enforcement tactic calculated to ensure an officer's safety," Ramirez, 473 F.3d at 1038 (Kozinski, J., concurring), and safeguard the CS's identity and the integrity of the DEA investigation.

As Mr. Chavez concedes in his brief, our conclusion that the DEA task force's knowledge can be imputed to Patrolman Chavez forecloses Mr. Chavez's ancillary arguments. Each of Mr. Chavez's remaining arguments regarding the scope of the initial detention, the consent to search, and the applicability of the automobile exception to the warrant requirement turn on the initial issue of the propriety of Patrolman Chavez's stop of Mr. Chavez. Accordingly, we address them only perfunctorily.

### 3. The Reasonableness of the Stop and Search

During his interaction with Mr. Chavez and Mr. Moreno, Patrolman Chavez followed each step of his routine traffic stop sequence. He asked Mr. Chavez for his documents, and chatted with both Mr. Chavez and Mr. Moreno about their travel plans. He wrote up two citations for Mr. Chavez (although one turned out to be a misstatement of New Mexico's traffic regulations). He then returned Mr. Chavez's papers and informed the pair they could leave. Before letting them do so, however, he re-initiated contact to request permission to search the truck. He did not need to do so, given the fact that he had probable cause all along. See, e.g., Vasquez-Castillo, 258 F.3d at 1212. However, by requesting consent,

Patrolman Chavez followed the directions of the DEA.[14]  Patrolman Chavez had

probable cause to believe the truck contained contraband; thus, the stop and

search were lawful under the Fourth Amendment.

## III.  CONCLUSION

At the time of the traffic stop, "the facts and circumstances within [the

DEA task force's] knowledge and of which they had reasonably trustworthy

information were sufficient to warrant a prudent man in believing that the

[defendant] . . . was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91

(1964).  Because TFO Mowduk – and the DEA task force collectively – had

probable cause to search the truck, so too did Patrolman Chavez.  And this, of

course, permitted his warrantless search of those locations in the truck that might

contain the narcotics (such as the bucket of nails).  As such, we **AFFIRM** the

denial of Mr. Chavez's motion to suppress.

---

[14]The district court concluded that Patrolman Chavez did not coerce Mr. Chavez's consent.  Although we need not decide the issue – because Patrolman Chavez had probable cause to search the truck regardless – we would be inclined to agree.  "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005) (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)).  An officer's questioning is non-coercive if a "reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."  Id. at 974-75 (quoting United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997)).  Although Patrolman Chavez did caution that he would run Chica around the truck regardless of whether the pair consented, Illinois v. Caballes, 543 U.S. 405, 409 (2005), confirms that the officer had the authority to do so.  More importantly, there was little evidence put before the district court that would cast as coercive Patrolman Chavez's request for consent.