FILED
United States Court of Appeals
Tenth Circuit

October 23, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

VICTOR ALONSO ALDERETE,

    Defendant - Appellant.

No. 18-1032
(D.C. No. 1:17-CR-00059-CMA-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

While searching Defendant Victor Alonso Alderete's trailer pursuant to a warrant, law enforcement found approximately ten pounds of methamphetamine. As a result, a grand jury indicted Defendant with one count of conspiring to distribute methamphetamine and one count of possessing with intent to distribute methamphetamine. Defendant moved to suppress certain evidence that supported the search warrant. Specifically, Defendant argued evidence obtained as a result of a prior search of the Ford Expedition Defendant drove was attained in violation of the Fourth Amendment and should be stricken from the warrant to search Defendant's trailer. After a hearing, the district court denied the motion. Defendant then pleaded

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

guilty to one count of conspiring to distribute methamphetamine and appealed the denial of his motion to suppress. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I.

The record reveals the following facts, consistent with the district court's findings. On February 7, 2017, a confidential informant (CI), who had provided the Drug Enforcement Administration (DEA) reliable information in the past, called DEA Special Agent Jeffrey Baumert and told him a shipment of drugs would be coming from Phoenix to Denver to be distributed throughout the Denver area. The next day, the CI met with Agent Baumert to give him more specific information. The CI told Agent Baumert a large shipment of crystal methamphetamine would be arriving in Denver and identified Defendant and several other individuals as being involved in this drug-trafficking scheme. The CI, who had discussed with these individuals possibly buying multiple pounds of methamphetamine from them, provided Agent Baumert with the phone numbers of the individuals and told Agent Baumert they would be driving a maroon Ford Expedition with the license plate number UQU461. The CI also told Agent Baumert where Defendant lived. The CI stated the individuals involved were smart and "would be able to sniff out law enforcement." ROA Vol. II, 121–22. Agent Baumert ran a license plate check, which revealed the vehicle associated with the license plate was a maroon Ford Expedition registered to Defendant's mother.

On February 9, 2017, Agent Baumert and his team began conducting surveillance on the CI and an auto body shop that the team determined was the "most likely place for [the shipment] to arrive." *Id.* at 125. That evening, the CI met with Agent Baumert again and relayed the shipment would arrive sometime in the night or early the next morning and the methamphetamine would be in a tire.

On February 10, 2017, Agent Baumert and his team again conducted surveillance on the auto body shop and the CI, who went to the shop. Agent Baumert told the CI to keep him informed throughout the day as to what was happening. Mid-morning, the CI told Agent Baumert the shipment of methamphetamine finally arrived and he would have to go to another location to sample it. The CI went to this other location, which turned out to be Defendant's trailer, to see the methamphetamine. Around 11:30 a.m., the CI texted Agent Baumert a picture of "what appeared to be crystal meth." *Id.* at 133. The CI left the trailer shortly thereafter.

Around 12:00 p.m., the CI met with Agent Baumert to describe what happened in Defendant's trailer. Those present while the CI was there included Defendant; Defendant's co-conspirator, Jaime Michael Rubio-Perez; and Defendant's girlfriend, Jessica Olguin. The CI told Agent Baumert that in the kitchen of the trailer, Defendant had cut open a tire that contained approximately ten pounds of crystal methamphetamine. Additionally, Defendant and his co-conspirator gave a sample of methamphetamine to the CI, which the CI gave to Agent Baumert. The CI told Agent Baumert it was "highly likely" they would move the drugs from the trailer now that

3

the CI had seen them there because these individuals were "savvy in their techniques." *Id.* at 137, 173. Agent Baumert knew based on his own experience "it is common for drug traffickers, after they've flashed or shown large quantities of narcotics, to move them to another location so as to avoid robbery or seizure by law enforcement." *Id.* at 137.

At this time, investigators were still surveilling the trailer and observed the maroon Ford Expedition driving in a manner consistent with a "burn run" near the trailer. Agent Baumert testified that a "burn run" is a way of driving to look for and evade surveillance and that evidence of a "burn run" includes making multiple turns, driving slowly, and passing the same location several times. *Id.* at 138–39. At this point, Agent Baumert was concerned the surveillance team might lose sight of the Expedition and that "all or some of those drugs were going to be moved from that trailer and would be lost." *Id.* at 139. Additionally, he believed there was probable cause to stop the Expedition based on records checks that indicated these individuals were involved in drug trafficking, the photograph from the CI of suspected methamphetamine, the sample of crystal methamphetamine the CI obtained from Defendant, the fact that the Expedition left the location where the methamphetamine had been reported, and the Expedition's manner of driving as it left. *Id.* at 140–41.

Based on this information, Agent Baumert ordered the Expedition to be stopped and, in doing so, noted the CI had seen Defendant with a small pistol in the past. At approximately 12:25 p.m., Officer Bartholomew Stark with the Denver Police Department (DPD) received the order and stopped the Expedition, which had a

severely cracked windshield. Defendant was driving the vehicle with two other passengers. As a part of standard procedure, Officer Stark asked for Defendant's driver's license. Defendant did not have a driver's license but handed Officer Stark a temporary paper identification, which turned out to be invalid. The other occupants, Roberto Duarte-Araujo and Rubio-Perez, did not have driver's licenses either. Officer Stark detained Defendant and the other occupants, handcuffed them, and sat them on the curb. Because none of the occupants had driver's licenses and the windshield was too cracked to drive safely, Officer Stark testified he was going to impound the car and that he would have had to conduct an inventory search before such impoundment.

Before he could conduct an inventory search, DEA Task Force Officer Mario Vasquez arrived at the scene. Detective Vasquez testified that, out of concern there might be a firearm, he searched the vehicle. During this search, Detective Vasquez spotted a small "clear plastic bag" with residue between the driver's seat and center console. He grabbed the plastic and saw the plastic contained what appeared to be less than two grams of cocaine. Upon finding the cocaine, Detective Vasquez ordered the three occupants to be arrested. Defendant was taken to the police station and questioned by DPD Officer Brian Jeffers. After Officer Jeffers advised Defendant of his *Miranda* rights, Defendant made two self-incriminating statements. He admitted, first, the cocaine in the car was his and, second, that he had a user quantity of cocaine at his trailer as well.

Meanwhile, at approximately 12:30 p.m., DEA Group Supervisor Thomas Miller led his team in securing Defendant's trailer. At this time, six law enforcement officers knocked on the door of the trailer and announced their presence. The parties dispute exactly what happened next. The Government contends the door opened on its own, while Defendant alleged the officers "shoved open the door." Op. Br. at 4. Either way, the six officers, all in tactical vests and the majority of whom had firearms, entered the trailer. Upon entering, they found Defendant's mother, Maria Alderete; Ms. Alderete's three-year-old son; and Jessica Olguin. Officers occupied the trailer for nine hours. During this time, they learned Defendant's girlfriend, Jessica Olguin, had a warrant out for her arrest. They arrested her and informed Olguin of her *Miranda* rights. She waived these rights and made incriminating statements about Defendant, including that Defendant is a dealer of methamphetamine and heroin and had received a shipment of drugs that morning. The officers did not search the trailer at that time because, even though Ms. Alderete indicated they could search the trailer, the officers waited for a search warrant "out of an apparent abundance of caution." ROA Vol. II, 302.

Agent Baumert applied for a warrant to search the trailer and signed the supporting affidavit. This affidavit relied on the following to establish probable cause to search the trailer: (1) Defendant and his co-conspirators departed the trailer and drove in a manner consistent with attempts to thwart surveillance by law enforcement; (2) Officers seized a user quantity of cocaine upon searching the Ford Expedition; (3) Defendant admitted the cocaine was his and that he had a user

6

quantity of cocaine at his trailer as well; (4) Olguin stated, among other things, Defendant trafficked narcotics; (5) a tire outside of the trailer bore knife marks; and (6) Defendant had a prior conviction for narcotics offenses. Around 9:00 p.m., a magistrate issued a warrant to search the trailer. The officers searched the trailer and located approximately ten pounds of methamphetamine in a backpack found on the top bunk bed in a bedroom.

A grand jury subsequently charged Defendant with one count of conspiring to distribute 500 grams or more of methamphetamine and one count of possessing with intent to distribute 500 grams or more of methamphetamine, both in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii). Defendant filed a motion to suppress and a motion for a *Franks* hearing.[1] In his motion to suppress, Defendant moved to suppress "all evidence obtained as a result of the unconstitutional detention of [Defendant] and the unconstitutional search of [Defendant's] car on February 10, 2017, including cocaine seized from the car and statements [Defendant] made during the interrogation following his unlawful arrest for possessing the cocaine." ROA Vol. I, 23. Defendant argued, because the cocaine and Defendant's self-incriminating statements were unconstitutionally obtained, they could not be considered in determining the sufficiency of the search warrant. With this evidence

---

[1] In *Franks v. Delaware*, the Supreme Court held the Fourth Amendment requires a district court to hold a hearing "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." 438 U.S. 154, 155–56 (1978).

7

stricken from the search warrant, Defendant argued, the search warrant was not supported by probable cause. In his motion for a *Franks* hearing, Defendant argued Agent Baumert knowingly omitted material information in the affidavit in support of the search warrant. Specifically, Defendant argued Agent Baumert omitted Olguin's "multiple convictions for crimes of dishonesty, including a conviction for lying to police officers." *Id.* at 35. If this information had been included in the affidavit, Defendant argued the affidavit would not have supported probable cause. Because the affidavit did not establish probable cause, Defendant argued the search warrant was invalid and the methamphetamine found as a result should be suppressed.

After a hearing, the district court denied both motions. In regard to the *Franks* motion, the court held the omission of Olguin's complete criminal history in the warrant affidavit did not establish a scheme to conceal her record. After all, the affidavit explicitly stated Olguin had a warrant for her arrest based on allegations of forgery. In regard to the motion to suppress, the court held that "more than ample evidence establish[ed] that the DEA task force had probable cause to believe that the maroon Expedition was moving narcotics on the afternoon of February 10, 2017." ROA Vol. II, 305. Alternatively, the court held the cocaine in the vehicle would have inevitably been discovered.[2] Therefore, the evidence would not be suppressed.

Defendant subsequently pleaded guilty to one count of conspiring to distribute 500 grams or more of methamphetamine. The district court sentenced him to 120

---

[2] While the Government argued Ms. Alderete consented to the search of the trailer, the district court did not reach the issue of whether this consent was valid.

months of imprisonment, to be followed by a five-year term of supervised release. Defendant timely appealed the denial of his motion to suppress. Here, "we review legal questions *de novo* but view the facts in the light most favorable to the government as the prevailing party." *United States v. Ludwig*, 641 F.3d 1243, 1247 (10th Cir. 2011).

## II.

A search warrant may only issue if it is supported by probable cause. *See United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005). "When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information." *Id.* On appeal, Defendant argues the warrant to search the trailer was tainted by (1) evidence obtained from the unconstitutional stop and search of the vehicle; and (2) evidence obtained from the unconstitutional entry into the trailer. Defendant argues the evidence obtained from the stop and search of the vehicle—specifically, the cocaine and Defendant's statements the cocaine was his and that he had additional cocaine at his trailer—was fruit of an illegal stop and search of the vehicle conducted without probable cause. Defendant argues the evidence obtained from the trailer—specifically, Olguin's statements incriminating Defendant—was fruit of an illegal entry into the trailer. Defendant maintains that, striking this unconstitutionally obtained evidence from the warrant affidavit, the affidavit does not contain enough evidence to support probable cause to issue a warrant to search Defendant's trailer.

9

Thus, Defendant continues, the ten pounds of methamphetamine found pursuant to this search of Defendant's trailer should have been suppressed.

We first address the constitutionality of the stop and search of the Expedition. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment does not require law enforcement to obtain a warrant to stop and search an automobile. *Carroll v. United States*, 267 U.S. 132, 153 (1925). Instead, to stop an automobile that has not committed a traffic violation, law enforcement must have "probable cause or a reasonable, articulable suspicion to believe the car is carrying contraband." *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008). To search the automobile, law enforcement must have probable cause to believe the automobile contains contraband. *Id.* at 1344–45. Therefore, if law enforcement had probable cause to believe the Expedition contained contraband, both the stop and search of the Expedition were constitutional.

Probable cause is a "common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). While probable cause is difficult to quantify, the Supreme Court has held that probable cause "does not demand any showing that such a belief be correct or more likely true than false." *Id.* Instead, "[p]robable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that

10

the car contains contraband or evidence." *Chavez*, 534 F.3d at 1344 (quoting *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001)).

When Agent Baumert ordered the Expedition to be pulled over, he knew Defendant, the driver of the Expedition, and his co-conspirators had received a shipment of approximately ten pounds of methamphetamine that morning. He knew they tried to sell at least some of that methamphetamine to the CI, indicating Defendant and his co-conspirators had begun the distribution process. Agent Baumert had the proof of this attempt to distribute with the sample of methamphetamine the CI had given him. Furthermore, he had information from the CI—who had not been wrong yet about this drug-trafficking scheme—that the methamphetamine would "highly likely" be moved from the trailer soon. He additionally knew Defendant and his co-conspirators, shortly after showing the CI the methamphetamine, got in the Expedition and drove in a manner that suggested they were using countersurveillance techniques designed to thwart law enforcement. This manner of driving only confirmed the possibility that Defendant and the co-conspirators were moving the drugs. Under these circumstances, we conclude there was a "fair probability," or probable cause to believe, that the Expedition contained methamphetamine. Thus, Agent Baumert had enough information to stop and search the Expedition.

The question becomes whether Agent Baumert's knowledge may be imputed to Officer Stark and Officer Vasquez, who stopped and searched the vehicle. This Court has made clear that when a law enforcement officer instructs another officer to

11

stop a car, the latter officer may "act[] on the strength" of the former's probable cause. *Id.* at 1347–48. This doctrine, known as the vertical collective knowledge doctrine, allows Agent Baumert's knowledge to be imputed to Officer Stark and Officer Vasquez when Agent Baumert ordered the automobile stopped, even if he did not communicate all of the information amounting to probable cause. *See id.* Accordingly, Officer Stark and Officer Vasquez were allowed to "act[] on the strength" of Agent Baumert's probable cause, making their stop and search of the Expedition valid.[3] *See id.*

Accordingly, because law enforcement had probable cause to believe the Expedition contained contraband, the evidence obtained by the search—the cocaine and Defendant's subsequent statement that the cocaine was his and that he had additional cocaine at his trailer—was not obtained in violation of the Fourth Amendment. Thus, the district court did not err in admitting this evidence or in holding this evidence must not be stricken from the warrant affidavit.

At this point, we consider whether this evidence is sufficient to support probable cause to search the trailer. That is, we consider whether, even if Defendant prevails on his argument that Olguin's incriminating statements should be suppressed and stricken from the warrant affidavit, the warrant contained enough evidence to support probable cause to search the trailer. Again, probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular

---

[3] Because the search was justified by probable cause, we need not reach the Government's alternative argument that the cocaine and Defendant's self-incriminating statements are admissible under the inevitable discovery doctrine.

place." *Sims*, 428 F.3d at 954. Striking Olguin's statements incriminating Defendant, the warrant was still supported by at least the Expedition's erratic driving leaving the trailer (i.e., the place to be searched), a user quantity of cocaine found in the Expedition, Defendant's statement that the cocaine found in the car was his, and Defendant's statement that he had a user quantity of cocaine in the trailer. This evidence, particularly Defendant's own statement that he had drugs in the trailer, provides more than "a fair probability that contraband or evidence of a crime" would be found in the trailer. Therefore, the search warrant was supported by probable cause, and the district court appropriately did not suppress the ten pounds of methamphetamine found during the execution of the search.

Because the search of Defendant's car was supported by probable cause and the subsequently issued warrant to search the trailer was supported by probable cause, the district court did not err in denying Defendant's motion to suppress. Accordingly, we AFFIRM.

<div style="margin-left: 50%;">

Entered for the Court


Bobby R. Baldock
Circuit Judge

</div>