**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 4, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

v.

CHARLES WILLIAM HOPKINS,

     Defendant - Appellee.

No. 06-3067
(D. Kan.)
D. Ct. No. 00-CR-40024-SAC-006

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN, HOLLOWAY** and **HOLMES**, Circuit Judges.

---

     This is the second appeal from the sentencing of Charles William Hopkins for his role in a multi-state conspiracy to manufacture and distribute methamphetamine. In the first appeal, we reversed and remanded for re-sentencing, concluding the district court applied an erroneous "proportional estimate" methodology to determine the quantity of drugs attributable to Hopkins. *United States v. Hopkins*, 128 Fed. App. 51, 55 (10th Cir. 2005) (*Hopkins I*). On remand, the district court held a two-day hearing. It allowed the government to

---

    [*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

present witnesses. However, it ultimately declined to consider this evidence because the government had not shown good cause for failing to present the testimony at the first sentencing. *United States v. Hopkins*, 408 F. Supp. 2d 1123, 1137 (D. Kan. 2005) (*Hopkins II*). After a lengthy analysis, the district court sentenced Hopkins to 108 months imprisonment, a net decrease of thirteen months from his original sentence of 121 months. *Id.* at 1147. The government appeals asserting the district court erred in rejecting its evidence at the second sentencing hearing and again applied an improper sentencing methodology. Exercising jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291, we vacate Hopkins' sentence and again remand for re-sentencing.

## I. BACKGROUND

Hopkins was one of twenty defendants named in a seventy-seven count superseding indictment filed on October 5, 2000. He was named in three counts: conspiracy to manufacture and distribute more than one kilogram of a mixture or substance containing a detectable amount of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 846 (Count 1) and two counts of using a telephone to facilitate the offense in violation of 21 U.S.C. § 843(6) (Counts 10 & 11).

At trial, the evidence demonstrated Hopkins participated in the conspiracy by stealing industrial-grade chemicals and laboratory equipment from his employer and providing the materials to Shane Wright, the methamphetamine

"cook"[1] and leader of the conspiracy.  Hopkins provided materials used to manufacture the methamphetamine in exchange for finished product.  On January 26, 2000, Shane Wright and Hopkins' brother, Michael, were arrested near Springfield, Missouri.  Immediately following news of the arrest, Hopkins went to his brother's home to remove an illegal firearm and then to Wright's house to assist in removing drug manufacturing evidence and guns.  Wright returned and reconstituted his lab to produce another cook.  The jury found Hopkins guilty of conspiracy to manufacture and distribute methamphetamine (Count 1), but concluded the government had not proved the conspiracy involved 50 grams or more.[2]  Hopkins was acquitted on Counts 10 and 11.

A. Original Sentence

Hopkins' presentence report (PSR) noted that the *specific* date Hopkins became involved in the conspiracy was not certain but he began supplying equipment and chemicals to Wright some time in 1999.  Because the date of Wright's arrest and subsequent destruction of evidence was certain (January 26,

---

[1]  "Cook" is a term used in the methamphetamine trade as a noun, meaning the person who actually performs the manufacturing process for the freshly prepared methamphetamine.  It is also used as a noun meaning an occasion when the methamphetamine is manufactured. A third use is as a verb, meaning to produce methamphetamine.

[2]  This determination changed the applicable statutory penalty section by removing the statutory minimum sentence of ten years in prison and imposing a maximum of twenty years, as opposed to life imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A)(viii) and § 841(b)(1)(C).

2000), the PSR concluded Hopkins was responsible for "at least the quantity of methamphetamine produced by Shane Wright from January 2000, until the raids and subsequent arrests of the defendant and codefendants in this case in March 2000." (R. Vol. III at 35.) The PSR determined the evidence at trial established Wright manufactured approximately sixteen pounds (7.25 kilograms) of methamphetamine in the two months prior to his January arrest. The PSR then extrapolated a quantity of sixteen pounds for the two-month period between the date Hopkins assisted in the clean up of his brother and Wright's houses and the date Hopkins' involvement in the conspiracy ended, his arrest in March.[3]

Based on this drug quantity, the PSR calculated a base offense level of 38. Adding two levels for possession of a firearm and two levels for obstruction of justice, the PSR reached a total offense level of 42. With an offense level of 42 and a Criminal History Category of I, the guidelines sentence was 360 months to life imprisonment. Hopkins filed a written objection to the drug quantity used to calculate his base offense level.[4] Primarily, he argued the jury's finding of a lesser drug quantity and his limited involvement in the conspiracy demonstrated his sentence should be based only on the drugs he received. He also stated, "DEA Agents' affidavits indicate . . . Wright's meth gang ceased all drug activity for the

_____

[3] The PSR applied the November 1, 1998 edition of the United States Sentencing Guidelines. All references to the guidelines in this order and judgment refer to the 1998 edition unless otherwise indicated.

[4] Hopkins presented other written objections which are not relevant here.

-4-

substantial period of time before their arrest on March 27, 2000" and a co-defendant stated there was only one cook in the time between the clean up and the March arrests. (Vol. III at 52.)

The government's written response pointed to the trial evidence of Hopkins' two-fold participation in the conspiracy – the provision of supplies for manufacturing the drug and his concealment of evidence – and asserted it was "a sufficient basis on which to hold [Hopkins] accountable for the entire amount of drugs attributable to the conspiracy as a whole." (*Id.* at 56.)

Prior to the day of the sentencing hearing, neither the government nor Hopkins intended to question witnesses before the court. Several hours before the sentencing hearing, the district court provided the government and Hopkins' counsel a proposed sentencing order applying a "proportionality analysis" which was not advanced by either party. However, at sentencing, the government objected to the court's proposed findings and asked for a continuance. The government explained it needed more time to review the record of the six-week trial to address the court's particular factual findings forming the basis for its analysis. It also asked for a continuance to present evidence regarding the court's relevant conduct determinations. Hopkins objected to a continuance, claiming it would be "very burdensome." (Vol. II at 229.) The district court denied the government's request and proceeded to sentencing.

The court concluded Hopkins should not be punished for all acts of the

conspiracy because the scope of his agreement in the conspiracy was more circumscribed. It determined Hopkins should be responsible for 21 grams of a methamphetamine mixture, representing the amounts he received from Wright for materials, and 28.35 grams of actual methamphetamine based on his proportional involvement in the post-January "cook." Although the quantity produced during the post-January cook was approximately one pound (400 grams), the court determined 28.35 grams represented Hopkins' "proportional involvement." (R. Vol. I at 128.) These quantities translated to a base offense level of 26. The court added the two-level enhancements for possession of a dangerous weapon and obstruction of justice for a total offense level of 30, resulting in a sentencing range of 97-121 months. The court sentenced Hopkins to the top of the range, 121 months imprisonment. It overruled Hopkins' objection to the PSR's failure to apply a four-level reduction for his "limited role," noting it was holding Hopkins responsible only for the "relevant conduct with which he was directly involved." (*Id.* at 139-40.)

On appeal, we determined the district court used an improper methodology and remanded for re-sentencing. *Hopkins I*, 128 Fed. App. at 55. We noted, "a finding by the court that Hopkins's role in the conspiracy was relatively small does not excuse it from making the relevant conduct inquiries." *Id.* We instructed the court to "calculate the range prescribed by the Guidelines . . . then . . . review the other relevant factors contained in the Guidelines, including those in

-6-

§ 3553(a), and apply a reasonable sentence" in accord with *United States v. Booker*, 543 U.S. 220 (2005), which was issued during the pendency of Hopkins' first appeal. *Id.* at 56.

B. Sentence on Remand

At the re-sentencing hearing, the government called Wright, his wife Tracy Wright, and Hopkins' brother, Michael. Wright testified Hopkins became involved in the conspiracy some time between March 1999 and March 2000. Tracy Wright testified he became involved in "the summer of 1999 . . . maybe October." (R. Vol. II at 385-86.) Michael testified Hopkins became involved in the operation about four to six months before Hopkins' arrest in March 2000, "maybe" September or October 1999. (*Id.* at 438-39.) According to these witnesses, the chemicals and equipment provided by Hopkins enabled Wright to manufacture exceptionally large amounts of methamphetamine from each cook. They further testified Hopkins not only used, but sold some of the product he received from Wright. In addition, Tracy Wright described in detail Hopkins' involvement in removing evidence from Wright's home after her husband's arrest.

In its Memorandum and Order, the district court disregarded this evidence because the government failed to carry "its burden of showing good cause for waiting until now to come forth with evidence and arguments that were readily available for presentation at the original sentencing." *Hopkins II*, 408 F. Supp. 2d at 1137. The court found there was nothing "of record to show either diligence or

a good faith reason for the government's delay in making and pursuing [Hopkins'] objection to the [PSR's drug quantity determination]." *Id.* It observed the government was aware of Hopkins' objection to the PSR and was given the court's memorandum but, "[d]espite this knowledge, the government chose not to present evidence at the first sentencing and even argued initially on remand, as reflected in its first sentencing memorandum, that the court should rely on . . . erroneous calculations and findings in the PSR." *Id.*

The court calculated Hopkins' base offense level based on his involvement after January 26, 2000, (the date of Wright's arrest) and determined Hopkins provided an "unspecified amount of liquid chemicals, some glassware . . . respirator masks and a set of scales" and assisted in removing and concealing evidence. *Id.* at 1138. It concluded the evidence demonstrated Hopkins only provided equipment to barter for small amounts of methamphetamine and, thus, did not enter into a conspiracy to manufacture large amounts of methamphetamine. Therefore, the court again "attributed 21 grams of a methamphetamine mixture for the defendant's bartering of chemicals, glassware and equipment." *Id.* at 1139. Although the court recognized Hopkins became more involved when he agreed to destroy and conceal evidence, the court found Hopkins' "principal motive . . . was to protect his brother." *Id.* at 140 (quotations omitted). The court concluded Hopkins could not foresee that Wright's next cook would yield one pound (approximately 400 grams) because Hopkins' previous

exposure to drug amounts was limited to Wright's "personal stash," which was equivalent to 54.4 grams (actual). Based on this amount, the court determined Hopkins' base offense level was 28.

Turning to sentencing enhancements, the court determined a two-level enhancement was appropriate under USSG §2D1.1(b)(1) because the government had proved by a preponderance of the evidence that Hopkins possessed a dangerous weapon when removing guns from his brother and Wright's houses. *Id.* at 1141-42. Similarly, the court applied a two-level increase pursuant to USSG §3C1.1 for obstruction of justice based on Hopkins' involvement in concealing evidence. However, unlike the first sentencing where the court determined Hopkins was not entitled to a four-level downward adjustment as a minimal participant in the conspiracy, the court found the evidence at trial supported a two-level reduction for a minor role because Hopkins was a "small player" who sold drugs "primarily to support his own habit." *Id.* at 1143. The court's determinations resulted in a total offense level of 30. With a Criminal History Category of I, the guidelines range was again 97 to 121 months imprisonment. *Id.* at 1143-44.

Addressing the 18 U.S.C. § 3553(a) factors, the court reiterated its assessment of Hopkins' relatively limited and minor role, his motivation to protect his brother, his "continuous and noteworthy" employment history, and his representation that he received medals and commendations while in the military.

*Id.* at 1144-45. The court determined these factors suggested an appropriate sentence less than the top of the guidelines range. *Id.* Looking at the need to avoid unwarranted sentencing disparities, the court rejected the government's suggestion that Hopkins' participation was the equivalent of specific other co-conspirators. Instead, it found his participation akin to that of Rhonda Hibbard, a chemist who assisted Wright in perfecting his product. Hibbard was sentenced to 54 months imprisonment based on the government's USSG §5K recommendations. The court gave significant weight to her sentence in sentencing Hopkins. *Id.* at 1147.

The court concluded a sentence of 108 months was within the sentencing range and consistent with the seriousness of Hopkins' minor role in the conspiracy. In a footnote, it noted that even had it "accepted the government's position for a base offense level of 38 . . . [it] would not have imposed a sentence longer than 108 months because of the other sentencing factors . . . [it] discussed." *Id.* at 1147 n.9.

## II. DISCUSSION

The government raises four issues: (1) the district court erred in refusing to consider the evidence presented at re-sentencing, (2) the sentence was the result of a flawed methodology used to determine relevant conduct, (3) the court erred in applying a two-level reduction for Hopkins' role in the offense, and (4) the sentence is unreasonable. Because the government's arguments rest primarily on

the evidence introduced at re-sentencing, our conclusion that the district court abused its discretion in refusing to consider the government's evidence obviates the need to address the remaining issues in detail.

Generally, re-sentencing on remand is de novo. *United States v. Keifer,* 198 F.3d 798, 801 (10th Cir. 1999). "[D]e novo resentencing *permits* the receipt of any relevant evidence the court could have heard at the first sentencing hearing." *Id.* (quotations omitted). Such review "furthers the goals of predictability and consistency in sentencing, because it allows for the fullest development of the evidence relevant to a just sentence." *United States v. Matthews*, 278 F.3d 880, 886 (9th Cir. 2002) (en banc) (quotations omitted). The district court, however, is not obligated to conduct a de novo re-sentencing. "[O]n remand [the court] has the *discretion* to entertain evidence that could have been presented at the original sentencing even on issues that were not the specific subject of the remand." *Keifer,* 198 F.3d at 801 (emphasis added). Thus, a court's decision to limit the scope of re-sentencing is reviewed for abuse of discretion.

We recognize there are situations where it is appropriate to limit re-sentencing to the record as it stands. In *United States v. Campbell*, we concluded the district court had misapplied a guidelines' enhancement, in large part due to the government's arguments at sentencing. 372 F.3d 1179 (10th Cir. 2004). We vacated the defendant's sentence and, on remand, limited re-sentencing to the

established record, declining "to give [the government] a second bite at the apple." *Id.* at 1183. We did so because, "[a]lthough Defendant alerted the government to the deficiency in its evidence [at sentencing], the government did not seek to cure the deficiency [by asking for a continuance], and instead made *patently erroneous legal arguments* as to why such proof was not needed." *Id.* (emphasis added).

Similarly, in *United States v. Forsythe*, we limited re-sentencing to the established record because the government knew the evidence was insufficient to prove a prior crime of violence well in advance of sentencing, but made no attempt to present the necessary evidence – even though given the chance to do so at two subsequent sentencing hearings. 437 F.3d 960, 963-64 (10th Cir. 2006). These cases reflect the general proposition that the government, forewarned of an evidentiary problem and shouldered with the burden of proof, must go forward with sufficient evidence or suffer the consequences. *See United States v. Dickler*, 64 F.3d 818, 832 (3d Cir. 1995) ("[The government's] case should ordinarily have to stand or fall on the record it makes the first time around.").

In both of these cases, the insufficiency of the government's evidence was obvious and the government ignored the deficiency even though given a chance to rectify the situation. That is not the case here. The government responded to Hopkins' drug quantity objection, which for the most part was a legal argument regarding relevant conduct. Though the government was on notice that the PSR's

calculations regarding the quantity of methamphetamine manufactured after Hopkins concealed evidence may be overstated, its response did not rely solely on Hopkins' post-January activities. Rather, it argued: (1) the difference between proof beyond a reasonable doubt at trial and proof by a preponderance of the evidence at sentencing permits relevant conduct to include drug quantities above the jury's estimate, (2) the industrial equipment provided by Hopkins could establish a reasonable inference he would foresee production of large amounts of methamphetamine, (3) trial testimony established the conspiracy produced over 200 pounds of actual methamphetamine, and (4) similar co-conspirators had been sentenced at a base offense level of 38. As a result, the government supported the PSR's estimate of the drug quantity attributable to Hopkins based on his involvement in the conspiracy both before and after the January clean-up.

Unlike *Campbell*, the government's legal argument was not "patently erroneous." In addition, the deficiency in the evidence was not as clearly defined as it was in *Campbell*. Moreover, we cannot say the government should have anticipated the court's unique interpretation of the facts in determining Hopkins' "proportional involvement." As the Third Circuit has noted, "it will frequently not be fair to expect the government to be prepared with evidence concerning any theory . . . advance[d] at the sentencing hearing." *Dickler*, 64 F.3d at 832. Here, the sentencing judge was the same judge who had listened to six weeks of testimony and had sentenced Hopkins' co-defendants. Certainly the government

-13-

could rely on a reasonable inference that Hopkins was involved with the conspiracy before the end of January. By that time, he was sufficiently trusted and relied upon to assist in dismantling the drug manufacturing operation and concealing the materials – only to return them to Wright to be used again.

*"When a dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information."* USSG §6A1.3, comment. (1998) (emphasis added). The government believed it had prepared a sufficient response to Hopkins' objections prior to the first sentencing hearing. The district court issued its report taking a unique view of the facts, such as Hopkins' inability to foresee the amount of the last cook, which had not been offered by either party. The government had only three hours to review a six-week trial transcript to counter the court's interpretation of the facts and to prepare an adequate "comment on the probation officer's determinations *and other matters relating to an appropriate sentence*." Fed. R. Crim. P. 32(i)(1)(C) (emphasis added); *see Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2465 (2007) ("[T]he sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure."); *see also Burns v. United States,* 501 U.S. 129, 136 (1991) (recognizing importance of notice and meaningful opportunity to be heard at sentencing). Even so, the government's timely request for a continuance was denied, despite the likelihood that the

continuance would have produced evidence of facts critical to the sentencing determination.[5] *See United States v. West,* 828 F.2d 1468, 1469-70 (10th Cir. 1987).

Perhaps the most important distinction here is the fact that the district court did not notify the parties the evidence would be limited to the established record prior to the re-sentencing hearing. Indeed, the court actually heard uncontested testimony which established Hopkins' involvement in the conspiracy by October 1999 at the latest. He provided industrial grade materials, including pure

---

[5] While the government has not argued the district court abused its discretion at the first sentencing in denying its request for a continuance, the factors we consider when determining whether an abuse of discretion occurred are instructive. We consider:

> the diligence of the party requesting the continuance; . . . the purpose underlying the party's expressed need for the continuance; the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance.

*West*, 828 F.2d at 1470. The district court noted that "[m]issing from the government's arguments and evidence is what amount and kind of chemical, equipment or glassware were furnished on [the date Hopkins entered the conspiracy] and what date they may have been first used by Wright." *Hopkins II*, 408 F. Supp. 2d at 1131 n.1. This is precisely the information the government elicited at re-sentencing. Hopkins' "inconvenience" was slight. He had no witnesses at the first or second hearing and argued only that a continuance would be burdensome. These factors indicate a continuance would have allowed the introduction of important evidence without unduly burdening Hopkins. Had there been compelling reasons for the court to deny the continuance in the first instance, the determination to reject the evidence presented at the second sentencing might find additional support.

hydrochloric and sulfuric acid, which allowed Wright to "produce extremely pure methamphetamine . . . about every two weeks" in amounts ranging from "a small batch [of] three or four hundred grams up to a large batch of one thousand grams." (R. Vol. II at 335-36, 341.) Hopkins was "paid" in amounts of methamphetamine that would increase depending on "how bad [Wright] needed the item or how well it would benefit" the cook. (*Id.* at 337.) In addition, Wright specifically told Hopkins that some of the materials he provided were "too small" to use with the size of "batches" Wright was producing. (*Id*. at 340.) All the witnesses testified Hopkins not only used the drug, but also packaged and sold it.

Had the government known the district court was going to disregard its evidence, the hearing would have been very different. The government would have mustered all possible evidence from the trial transcript and other evidence of record. But it did not, depending instead on the first-hand testimony of its witnesses. However, after hearing this evidence, the district court chose to disregard it. Our research has failed to uncover any case where the court allowed presentation of evidence at re-sentencing and then determined equity required its exclusion. The only purpose we can fathom is to sanction the government. But the extremity of this sanction goes far beyond the egregiousness of the government's conduct. *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002) (exclusion of witness improper sanction for a discovery violation, noting "[i]t would be a rare case where, absent bad faith, a district court should

exclude evidence rather than continue the proceedings"). While we do not

condone the government's failure to respond immediately and specifically to

Hopkins' argument regarding the amount of post-January production, the

government did not act in bad faith. It was caught unaware at the first hearing

but immediately sought to redress its oversight. Though that opportunity was

denied, it submitted evidence at its next opportunity. This is not the sort of

"second bite at the apple" or unfair opportunity contemplated in our earlier cases.

*United States v. Torres,* 182 F.3d 1156, 1164 (10th Cir. 1999).

The district court abused its discretion in failing to consider the

government's evidence at re-sentencing.[6] It arbitrarily refused to consider

evidence before the court which clarified Hopkins' relevant conduct, even though

there is no indication the government engaged in "deceptive, obstructive, or

otherwise inappropriate conduct." *Matthews*, 278 F.3d at 889. While the

government could have done more to prepare for the first sentencing, the court's

refusal to fully explore the factual issues at re-sentencing prejudiced the

---

[6] *United States v. Booker*, 543 U.S. 220 (2002), "fundamentally changed the way defendants are sentenced." *United States v. Sims*, 428 F.3d 945, 960 (10th Cir. 2005). It invalidated the mandatory nature of the guidelines, making them advisory, and invited a new approach to the district court's consideration of evidence at re-sentencing. *See United States v. Galarza-Payan*, 441 F.3d 885, 887 (10th Cir.), *cert. denied*, 127 S.Ct. 434 (2006). The government argues the opportunity to present new evidence relevant to an advisory sentencing scheme, alone, would warrant de novo re-sentencing. However, the government does not explain why the evidence it presented would not have been warranted prior to *Booker*. Therefore, we will not address this issue.

government by excluding critical evidence.

As to the government's remaining arguments, the evidence does not support the district court's determination that Hopkins' involvement was limited to post-January activities, or that he could not foresee Wright would produce more than his "personal stash." Thus, the district court's determination of the guidelines range is clear error. "A sentence cannot . . . be considered reasonable if the manner in which it was determined was unreasonable, i.e., if it was based on an improper determination of the applicable Guidelines range." *United States v. Kristl,* 437 F.3d 1050, 1055 (10th Cir. 2006). When the sentence is procedurally unreasonable, we must remand "without reaching the question of [substantive] reasonableness -- unless the error is harmless, that is, unless the error in calculating the Guidelines range did not affect the sentence selected." *United States v. Tom*, 494 F.3d 1277, 1282 (10th Cir. 2007) (quotations omitted). The error here is not harmless. On remand, the district court shall consider all relevant evidence.[7]

---

[7] The government requests reassignment of Hopkins' case on remand. Because we direct reassignment of a case "only in the most unusual and exceptional circumstances," we deny the request. *United States v. Roberts,* 88 F.3d 872, 885 (10th Cir. 1996), *superseded on other grounds by statute*, Omnibus Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009-25, *as recognized in United States v. Meacham*, 115 F.3d 1488, 1491 (10th Cir. 1997). We trust the district court will fully reflect on all the evidence and the reasonable inferences arising therefrom in reaching its final decision. The government's motion to strike certain attachments to Appellee's brief is also denied.

We REMAND to the district court with instructions to re-sentence Hopkins in accordance with this Order and Judgment.

ENTERED FOR THE COURT


Terrence L. O'Brien
Circuit Judge

No. 06-3067, United States v. Hopkins

**HOLLOWAY**, Circuit Judge, dissenting:

I am not convinced that the district judge abused his discretion in declining to consider the evidence submitted by the government at the second sentence hearing. The majority does not fully address the grounds for the trial judge's ruling, and I believe that the abuse of discretion standard of review requires us to do so. The majority acknowledges that "a court's decision to limit the scope of re-sentencing is reviewed for abuse of discretion. . . " Majority Opinion at 11. And "there are situations where it is appropriate to limit re-sentencing to the record as it stands." *Id. See United States v. Campbell,* 372 F.3d 1179, 1183 (10th Cir. 2004). Considering the grounds for the judge's evidentiary ruling properly, I am convinced that the ruling should clearly be upheld. Accordingly, I respectfully dissent.

The excluded evidence is very succinctly summarized by the majority. As the summary shows, the excluded evidence told the basic story of the Defendant's involvement in this substantial conspiracy, with the witnesses attempting to recall when the Defendant first became involved and what the extent of his involvement was. (The evidence is more fully detailed in the Brief of Appellant at pp. 27-32.)

It is important to focus on why it was only after remand from the first appeal that the government presented this evidence. The government conceded at the hearing below that it had not developed these facts with specificity at trial.

*United States v. Hopkins*, 408 F. Supp. 2d 1123, 1137 (D. Kan. 2005). No

challenge is raised to the sufficiency of the evidence to support the conviction.

But as the prosecution must have known, the judge's obligation to calculate drug

quantity at sentencing, as part of the required relevant conduct analysis, required

a more detailed evidentiary basis than was necessary to attain conviction. But the

government was not prepared at the first sentencing hearing to present the

witnesses that it presented at the second hearing, even though this was apparently

the best evidence that the government had available to show the Defendant's role

in the conspiracy.[1]

The government chose instead to rely on the PSR rather than to present

evidence at the first sentencing hearing, in spite of the fact that a key assumption

made by the probation officer in the PSR (that Shane Wright had continued to

produce methamphetamine for two months after his initial arrest in January 2000

at about the same pace as before) had been challenged by Defendant's objections

to the PSR. Not only that, but the trial evidence on the point had apparently been

conflicting, as our Order and Judgment in the first appeal quoted the trial judge as

having said that the "more credible evidence at trial establish[ed] that . . . after

his arrest Shane Wright did not continue manufacturing methamphetamine at the

_____

[1]I am not aware of any suggestion that the government could not have
presented these witnesses at the first hearing had it been prepared to do so.
Moreover, as counsel for the government admitted at oral argument, the
government did not tell the trial judge, at the first sentencing hearing, that it
wanted a continuance so that it could introduce this testimony.

same or similar levels as before the arrest." This, it seems clear, was one basis (although not the only one) for the trial judge's later finding that the government "knew or should have known the weight of evidence did not support the PSR's assumption" on drug quantity. 408 F. Supp. 2d at 1137 & n.4. The majority does not purport to hold this finding to be clearly erroneous. Instead, the majority finds an abuse of discretion in the judge's decision not to give the government a second chance to produce the evidence it should have known was necessary the first time around, and the majority does so without examining the government's conduct.

The district judge found nothing "to show either diligence or a good faith reason for the government's delay in making and pursuing" its objection to the PSR's decision to calculate drug quantity only for the time period after January 26, 2000. *Id*. at 1137. As the majority notes, in the face of the facts that put the government on notice of the error in the assumption made in the PSR, the government "even initially argued *on remand* . . . that the court should rely on . . . erroneous calculations and findings in the PSR." (Emphasis mine.) Having failed to address in any meaningful way the government's derelictions at the first sentencing hearing, the majority notes without further comment the fact that the government continued to cling to its flawed position on the PSR's critical error even after remand from the first appeal.

In sum, there is no basis for finding an abuse of discretion in the judge's

-3-

rejection of the evidentiary showing, especially since the trial judge's reasoning has not been fully addressed, much less rebutted. It seems that the district court's proposed findings, issued just hours before the first sentencing hearing, caught the government by surprise because of the unusual approach the judge took to calculating the drug quantity at that time. But it seems to me that the majority disregards the important fact that the government was on notice from the trial testimony (and other evidence referenced by the district judge in n.4 of his Memorandum, 408 F. Supp. 2d at 1137) and from the Defendant's objections to the PSR that the PSR's critical assumption was erroneous.[2]

Thus, the key point that the majority fails to address is that, at least in the view of the trial judge who was most familiar with the case, at the first hearing the government should have been prepared to present its evidence *before* the judge issued his proposed sentencing order which prompted the government to move, unsuccessfully, for a continuance. The government should have been prepared to do that because it knew or should have known that evidence from which the district court could properly make a calculation of the drug quantity to be attributed to the Defendant had not yet been adduced and that the PSR's calculation had been based on a mistaken view of the evidence.

The majority does not address the district court's concern that the

---

[2]That critical error, as described *supra*, was that Shane Wright had continued to manufacture methamphetamine for two months after his first arrest on January 26, 2000, at about the same rate that he had before.

government did not show good cause for not being prepared to present its evidence at the first hearing. The government's limited time to respond to the trial judge's proposed findings and holdings at the first sentencing hearing does not provide any excuse for its failure to address the error in the PSR and to present the basic evidence that would support a drug quantity finding that it desired. This, as I understand it, was the real basis of the district judge's ruling, and I do not see how that ruling can be deemed an abuse of his broad discretion. It seems to have been the district judge's view that the government was willing to rely on a PSR that it knew was erroneous because it liked the result, and further that this less than praiseworthy conduct was exacerbated when the government continued to cling to that position in its first submission after remand.

Therefore, I cannot join in saying that "the government's submission of evidence on remand was not a second bite at the apple or an unfair opportunity to make the record that it failed to make in the first instance." It certainly *was* an attempt to make the record that it failed to make in the first instance. There is no showing that it was an abuse of discretion for the trial judge to conclude that it was an unfair opportunity which the government sought.

Accordingly I respectfully dissent.